Bascom W. BENTLEY, III, Petitioner,

v.

Joe Ed BUNTON and Jackie Gates, Respondents.

No. 00–0139.

Supreme Court of Texas.

Argued Feb. 21, 2001.

Decided Aug. 29, 2002.

Rehearing Denied Feb. 13, 2003.

Mike A. Hatchell, Molly H. Hatchell, Hatchell P.C., Tyler, George Chandler, Reich Chandler, Chandler Law Offices, Lufkin, Darrin M. Walker, Law Office of Darrin Walker, Kingwood, for Petitioner.

Robert L. Crider, Palestine, Armando De Diego, The Law Office of Armando De Diego, Dallas, Ronald D. Wren, Bedford, for Respondents.

Justice HECHT delivered the opinion for the Court with respect to Parts I, III, IV, and V, in which Justice OWEN, Justice BAKER (except for Part V–D), Justice JEFFERSON, and Justice RODRIGUEZ joined, with respect to Part II, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, Justice BAKER, Justice HANKINSON, Justice JEFFERSON, and Justice RODRIGUEZ joined, and with respect to Part VII, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, Justice HANKINSON, Justice JEFFERSON, and Justice RODRIGUEZ joined, and an opinion with respect to Part VI, in which Justice OWEN, Justice JEFFERSON, and Justice RODRIGUEZ joined.

For months, the host of a call-in talk show televised on a public-access channel

in a small community repeatedly accused a local district judge of being corrupt. A co-host on some of the shows expressed agreement with the accusations but never himself used the word "corrupt". The judge sued both of them for defamation. Based on conclusive proof that the accusations were false and defamatory, and on jury findings that the defendants acted with actual malice as well as a specific intent to cause injury, the trial court rendered judgment awarding the plaintiff actual and punitive damages assessed by the jury against each defendant separately. Notwithstanding the jury's finding that the defendants conspired together, the court refused to hold them jointly liable for the actual damages each caused. The plaintiff and both defendants appealed. The court of appeals affirmed the judgment against the talk show host who made the repeated accusations and reversed the judgment against his co-host.[1] The liable defendant and the plaintiff seek review here.

The legal and evidentiary issues raised by the parties are too numerous and varied to summarize at this point, but principal among them are these:

- Does article I, section 8 of the Texas Constitution restrict liability for defamation of a public official more than the First Amendment to the United States Constitution?

- Under the circumstances presented here, are accusations that a public official is corrupt actionable statements of fact or protected expressions of opinion?

- Can a person be liable for defamation if all he does is express agreement with another's defamatory statements?

- Were the accusations of corruption in this case false as a matter of law?

- Can a person who falsely accuses a public official of being corrupt be proved by clear and convincing evidence to have acted with actual malice despite his assertions that he sincerely believed the accusations?

- Under the circumstances, are awards of $7 million for mental anguish damages and $1 million punitive damages excessive as a matter of law either under Texas common law or the First Amendment?

We agree with the court of appeals that only the one defendant is liable for defamation, but we conclude that the jury's finding of $7 million in mental anguish damages has no evidentiary support and is excessive as a matter of law by constitutional standards. We remand the case to the court of appeals for further proceedings.

## I

"Q&A", a live, ninety-minute, call-in television talk show, began broadcasting weekly in 1990 on a public-access channel available to cable subscribers in and between Palestine and nearby Elkhart, two towns in Anderson County in East Texas. At that time, the population of Palestine, the county seat, was about 18,000, and the population of Elkhart was just over 1,100.[2] All of the participants in "Q&A"—including the self-described hosts, producer, director, investigators, reporters, and cameraman—were unpaid volunteers. The privately produced programs generally consisted of one or two hosts talking about various subjects of local interest, either by themselves or with guests or callers. Programs were often rerun during the week.

---

1. —— S.W.3d —— (Tex.App.-Tyler 1999).

2. TEXAS ALMANAC 157 (1995).

Program content ranged from informational to editorial.

Defendant Joe Ed Bunton, a Palestine native, helped start "Q&A". Bunton had returned to Palestine several years earlier after college and fifteen years in the army, and had been elected to one term on the city council. He was defeated in his bid for re-election, as well as in three successive attempts to regain a seat on the council. After his first defeat, he became interested in public-access television as a means of increasing his involvement in grassroots politics. Bunton began hosting "Q&A" programs in 1994. In his brief in this Court, Bunton describes "Q&A" as "a wide-open, sometimes caustic and/or an uncivilized public forum, which has become the electronic soapbox for Palestine, Texas."

In the spring of 1995, Bunton learned of a criminal case that had been pending for two years in the 369th District Court before Judge Bascom Bentley III, one of four judges whose districts included Anderson County. Bentley, himself a lifelong resident of the county, had been appointed to the district court in 1989, elected in 1990, and re-elected in 1994. He had previously served as Palestine city attorney, county attorney, and judge of the county court at law. The defendant in the case, a young man named Curbo, had been charged with robbery (purse-snatching), and in March 1993, Judge Bentley had placed him on what the Texas Code of Criminal Procedure calls "community supervision"—a kind of probation—for five years with his adjudication of guilt deferred.[3] Barely eight weeks later, Curbo had been arrested for credit card abuse.[4] Court records reflected that in June 1993 the district attorney filed a motion to adjudicate Curbo's guilt on the robbery charge and that Judge Bentley released Curbo on his personal recognizance—that is, without a surety bond[5]—without ruling on the motion. From these records, Bunton surmised, without discussing the case with Curbo's lawyer or the district attorney, that Bentley's release of Curbo was improper, and furthermore, that Bentley had left the motion pending for criminal design: so that he could use the threat of further proceedings against Curbo to pressure Curbo's father, then a mayoral candidate, into acting as directed in the event he became mayor. Bentley, Bunton supposed, could control Curbo's father by threatening to adjudicate Curbo and sentence him to prison. Had Bentley been so motivated, his conduct would undisputedly have been criminal.[6] In fact, however, Curbo's release without a surety bond had been requested by Curbo's lawyer without objection from the district attorney and was clearly within Bentley's discretion,[7] and the case had remained pending because neither Curbo's probation officer nor the district attorney believed that Curbo, who suffered from learning disabilities, should be incarcerated. Accordingly, neither Curbo's lawyer nor the district attorney had ever requested a ruling on the motion to adjudicate. Moreover, Curbo's father was not elected mayor.

---

3. *See* Tex.Code Crim. Proc. art. 42.12, § 5(a).

4. *See* Tex. Penal Code § 32.31.

5. *See* Tex.Code Crim. Proc. arts. 17.03, 17.031, 17.04.

6. *See, e.g.,* Tex. Penal Code §§ 36.02 (bribery), 36.03 (coercion of public servant or voter), 39.02 (abuse of official capacity).

7. *See* Tex.Code Crim. Proc. art. 17.03(a) (stating that with certain exceptions not applicable here, "a magistrate may, in the magistrate's discretion, release the defendant on his personal bond without sureties or other security").

Bunton also learned early in 1995 that Anderson County Sheriff Mickey Hubert had refused to arrest one of his own deputies, Danny Harding, on a warrant that an assistant district attorney had helped procure without the approval of the district attorney, who had determined that evidence concerning Harding should first be presented to the grand jury. After what Bunton called an "investigation" of the circumstances, he concluded that Hubert had violated article 2.18 of the Texas Code of Criminal Procedure ("Custody of Prisoners")[8] and section 39.02(a)(1) of the Texas Penal Code ("Abuse of Official Capacity"),[9] even though the district attorney had had the warrant recalled. Bunton also concluded that Bentley, who had not issued the warrant and was in no way involved in the matter, was responsible for failing to convene a court of inquiry to determine whether Hubert had violated the law[10] and to have him arrested.[11]

On the "Q&A" program broadcast on June 6, 1995, a videotape excerpt of which is in the record, Bunton announced that the topic for discussion would be "corruption at the courthouse". He charged that Bentley's release of Curbo and the delay in resolving the case "makes the system look corrupt". He asserted that his accusations against the judicial system in Anderson County were "true". He admonished Bentley to "clear this case off your docket and quit hanging it over these people's heads". He also discussed the Harding matter and explained why he thought Bentley and Hubert had both acted illegally. Bunton claimed to have made lengthy investigations of both matters, reviewing records and interviewing employees at the courthouse. He dared Bentley and Hubert to call in or come on the program and show that his allegations were untrue:

> Bascom, you and Mickey call in and say it ain't true. Say, "Joe Ed, you're lying. You're telling untrue things about it." I dare you. You're welcome to come in here. You can come out here. You can call in here. The fact is, y'all are corrupt, y'all are the criminals, y'all are the ones that oughta be in jail.

After the program, Bentley telephoned Bunton's home and left word for him to call back. Bunton did not return the call. Bentley also called "Q&A" and asked a volunteer there to tell Bunton to stop calling him corrupt. The volunteer acknowledged that Bunton was "going too far" but said that Bunton was "out of control" and there was nothing to be done.

---

8. *Id.* art. 2.18 ("When a prisoner is committed to jail by warrant from a magistrate or court, he shall be placed in jail by the sheriff. It is a violation of duty on the part of any sheriff to permit a defendant so committed to remain out of jail, except that he may, when a defendant is committed for want of bail, or when he arrests in a bailable case, give the person arrested a reasonable time to procure bail; but he shall so guard the accused as to prevent escape.").

9. TEX. PENAL CODE § 39.02(a)(1) ("A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly ... violates a law relating to the public servant's office or employment....").

10. *See* TEX.CODE CRIM PROC. art. 52.01(a) ("When a judge of any district court of this state, acting in his capacity as magistrate, has probable cause to believe that an offense has been committed against the laws of this state, he may request that the presiding judge of the administrative judicial district appoint a district judge to commence a Court of Inquiry.").

11. *See id.* art. 2.10 ("It is the duty of every magistrate to preserve the peace within his jurisdiction by the use of all lawful means; to issue all process intended to aid in preventing and suppressing crime; to cause the arrest of offenders by the use of lawful means in order that they may be brought to punishment.").

A videotape of the "Q&A" program two weeks later, on June 20, shows Bunton reporting that Bentley had threatened to sue for defamation based on the June 6 program. In fact, Bentley did not sue until almost eight months later. On the program, Bunton asserted: "I stand by everything that I said that night and I'm gonna give you more tonight about this issue." Bunton again challenged Bentley to come on the program and deny the allegations. Bunton repeatedly stated that Bentley was not doing his job or earning his salary. He asserted that his accusations were supported by records at the courthouse. Holding up copies of some records that he had obtained, Bunton said: "You can't sue anybody for slander when they're telling the truth, and this is the truth, and there is no libel or slander in this, not on our part. If it is, it's on the part of the records in the courthouse, and I don't believe that's the case." Later in the program, Bunton referred to a "clique" of public officials and others in Palestine, Bentley included, who often lunched together. Bunton finished by saying that "the five most corrupt political officials at the county level, in alphabetical order, would be Bentley, [District Judge Sam] Bournias, [District Judge Jerry] Calhoon, [District Attorney Jeffrey] Herrington, and [Sheriff Mickey] Hubert—top five, the most corrupt public officials."

The videotape of the June 27 "Q&A" program shows Bunton inviting viewers to call in and register their views on whether Bentley was corrupt. At the bottom of the television screen was this legend: "Q&A POLL: IS JUDGE BENTLEY COR-RUPT?" Bunton then told viewers he would again discuss Bentley's "corrupt-ness, my opinion, but you'll have to make up your own opinion." Bunton recounted his version of the Curbo case as he had on the June 6 and June 20 broadcasts, based on what he again said was an "investiga-

tion" of the facts and records which he said could be obtained at the courthouse. He reiterated that he had invited Bentley to be on the program to disprove the allegations of corruption but that Bentley had not accepted the invitation and had instead threatened suit. Bunton said he welcomed the suit because "the facts are with us and this is the truth, and therefore it is not slander." He repeated that his assertions were based on public records and com-plained that although he had provided cop-ies to the local newspaper, it had not writ-ten a story.

On the same program, Bunton again referred to "self-confessed clique-ers" who were Bentley's "cronies" and continued: "You know, last week one of the things that we did, or I did, was that I came up with what I think are the five most corrupt elected officials in Anderson County, and in alphabetical order they are Judge Bent-ley, Judge Bournias, Judge Calhoon, Dis-trict Attorney Jeff Herrington, and Sheriff Mickey Hubert." In response to reports he had heard that Judge Bentley was, in Bunton's words, "rather nervous and upset and just not himself" because of the allega-tions on "Q&A", Bunton stated: "Well, Judge, you can expect this kind of pres-sure to stay on you, the full-court 'Q&A' press is gonna stay onto you until you straighten up, or what really'd be better, Bascom, is just resign and get off the bench, would be the best thing you could do for Anderson County." Again referring to public records, Bunton said Bentley "is corrupt, that's my opinion."

When a person called in to say that he did not see why Bentley should be criti-cized for being lenient with a young of-fender like Curbo, Bunton responded: "This is my suspicion—there's no way to prove this, but this is what my concern is." Bunton then reiterated his allegation that Bentley had delayed resolution of the Cur-

bo case to "use" Curbo's father, who had been a candidate for mayor. He hypothesized that

> [Curbo's] father would be told, "We need you to vote for this this way," and he says, "No, I don't want to do that," and they'll say, "Look, your son is looking at forty years in the state pen, and I, we could have him sentenced, and he will not get out of prison while you're alive, and you know what kind of ties we have within the Texas Department of Criminal Justice, and we can pick his roommate, and it will not be an enjoyable time in the Texas Department of Correction."

Importantly, Bunton added this:

> Judge Bentley has been one of the hardest people for 'Q&A' to finally get some things that we could really dig our teeth in and were confident to go on the air on and go after him on because he is very, very slick. Okay? And we've known this, and we've known what he's been doing for a long time, but it's been difficult to pin down.

However, Bunton claimed, court records showed that his allegations were factual. "The center of evil," he said, "is in that courthouse."

Another caller, who described herself as "a good friend of Judge Bentley's", stated that the judge was "a wonderful man" and "a wonderful father". In response, Bunton asked: "All right, let me ask you this: Have you seen these records of what's gone on in this case?" When the caller said she had not, Bunton offered to make the records he had available to her, saying: "I think when you see the facts, you will have only one opinion." "The question is," Bunton went on, "is Judge Bentley corrupt? And my opinion is, based on the facts, he is."

About the same time as these broadcasts, during the summer of 1995, Bunton happened to meet a long-time friend going into a store. At trial, the friend testified as follows:

> We—like I say, I've known [Bunton] for quite some time, and we spoke to each other as we came in [the store]. And as we began to talk, he began to speak more and more about the injustices in Palestine and Anderson County politics, and that there was some—a particular group of people referred to as "the clique" that were responsible for some of the shortcomings that we had in our government. And he was—he was telling me that he was wanting to expose all of them, and he'd bring it all to the surface, and anything that was not right with the system, he wanted to bring it out.... [H]e said that he had investigated and done a lot of research on all of the members—on a lot of the members he said were a part of this clique here in Palestine, and he was able to get quite a bit of information on quite a few of them that had done something that he felt like was wrong and needed to be aired. He said that the one that he really couldn't get anything on that bothered him was old Bascom Bentley.... [M]y response was that I told him I didn't think he would ever find anything on him because I didn't really think there was anything to find. But he said, "No, he's—he's in with that clique, and he has—he's known to associate with them. He goes out to eat with them at lunch. He's right in there with them, and he's doing something. I just don't know what it is."

Notably, Bunton did not deny this account of the conversation at trial.

Defendant Jackie Gates first appeared on "Q&A" on July 11 as a guest, discussing the local Crime Stoppers' list of most wanted criminals. He soon joined the program as Bunton's co-host. The two shared a military background, Gates having re-

tired from the Air Force as a colonel with thirty-two years' service. Gates had lived in Palestine since 1990. Like Bunton and the others involved in "Q&A", Gates was an unpaid volunteer, acting from time to time as host, investigator, reporter, director, and cameraman.

Gates had never seen "Q&A" before July 11 because he was not a cable television subscriber, so he was not at first aware of the allegations Bunton had made in June that Bentley was corrupt and criminal. But he was soon made aware by Bentley himself. On October 2, Gates attended a hearing on a criminal case over which Judge Bentley was presiding. The defendant, Gerald Battles, was complaining of ineffective assistance of counsel in prior proceedings, and Gates, who was not an attorney, had been advising him. When the hearing concluded, Bentley asked Gates to step into his chambers, where they engaged in what both later recalled was a "cordial" conversation. Bentley began by warning Gates that "it was a dangerous, dangerous game for him to get involved in giving advice to inmates". Bentley then turned to "Q&A" and Bunton. He complained to Gates that Bunton's accusations of corruption were "not right". Gates agreed and told Bentley that Bunton was "a lot of times out of control" and that he, Gates, had joined the program to clean it up and stop the name-calling. At trial, Gates testified consis-

tently that he disagreed with Bunton's accusations that Bentley was corrupt and criminal but that he could not control what Bunton said on television. Although Gates testified that he once told Bunton off the air not to call Bentley corrupt, in fact Gates appeared on many "Q&A" programs when Bunton repeated the accusation, and on the air Gates never protested.

Gates was on "Q&A" on January 30, 1996, when Bunton repeatedly referred to Bentley as "the most corrupt", "the number one corrupt", and "the ultimate corrupt" elected official in Anderson County. On that program, Bunton made four additional allegations against Bentley. One was that Bentley, along with the other district judges in Anderson County, had failed to supervise the county auditor[12] and county commissioners court,[13] who, Bunton said, should have discovered years earlier that the district attorney was not properly depositing money paid on "hot checks" and forfeited property funds in the county treasury. Another allegation was that Bentley had failed to report two other district judges, Judge Bournias and Judge Calhoon, for judicial misconduct[14] for dismissing petitions Bunton had filed to remove the district attorney.[15] A third allegation was that Bentley had contributed to the election campaigns of candidates for county judge, an officer who presides over the county commissioners court and is thus

12. *See* Tex. Loc. Gov't Code §§ 84.002 (providing for the appointment of a county auditor in certain counties by the district judges), 84.009 (providing for removal of the county auditor by the appointing judges).

13. *See* Tex. Const. art. V, § 8 ("The District Court shall have ... general supervisory control over the County Commissioners Court...."); Tex. Gov't Code § 24.020 ("The district court has ... general supervisory control over the commissioners court....").

14. *See* Tex.Code Jud. Conduct Canon 3(D)(1) ("A judge who receives information clearly

establishing that another judge has committed a violation of this Code should take appropriate action. A judge having knowledge that another judge has committed a violation of this Code that raises a substantial question as to the other judge's fitness for office shall inform the State Commission on Judicial Conduct or take other appropriate action.").

15. *See* Tex. Loc. Gov't Code § 87.015 (providing for petitions for the removal of a district attorney and other officers).

subject to the general supervisory control of the district court.[16] Finally, Bunton alleged that Bentley had given a criminal defendant, Carroll Neal too light a sentence for cattle theft and then refused to recognize Neal's "good time" credit given by the sheriff. Bentley, Bunton said, was "the most corrupt elected official, and if you don't believe that, all you need to do is start digging around the courthouse".

On the February 1 "Q&A" program, Bunton repeated, with Gates present, that Bentley had made contributions to candidates for county judge. "That really raises a question about his integrity," Bunton stated. "It's just more to prove that he deserves to be in the number one position of corrupt elected officials. We can talk about the Curbo deal, but it's one thing on top of the other. Judge Bascom Bentley III is the most corrupt elected official." Two weeks later Gates co-hosted the show as Bunton announced a "Bentley Hot Line"—a telephone number viewers could call to report anything Bentley had done that was "outrageous that might put a bad light on his profession as a judge or his character". Bunton coached callers on how to report on Bentley without revealing their identity. Gates testified at trial that he remembered encouraging viewers at one point to call the "hot line" with both good and bad information about Bentley to give "the entire story," but the videotapes in the record do not contain any such statement by Gates.

Gates never himself used the word "corrupt" with reference to Bentley, but there is evidence that he nevertheless expressed agreement with Bunton's accusations, despite having told Bentley during their meeting in Bentley's chambers that he did not think Bentley was corrupt. During the March 7 program, a videotape shows that Bunton looked directly at Gates, who was seated beside him, while he listed the top five corrupt officials in Anderson County, with Bentley being number one. Later in the program, when Bunton told a caller that district attorney Herrington was the number one corrupt official, she reminded him that he had earlier said Herrington was number two. "He is," Bunton replied. When Gates attempted to correct him with, "Well, you said . . .," Bunton interrupted, "Bascom Bentley's number one." "Yeah," Gates replied. Asked at trial to explain what he had meant by saying "yeah", Gates testified, "I think it was a spontaneous reaction more than anything, is all I can say."

As the program continued, Bunton again returned to the Curbo case. Looking over at Gates, Bunton admonished an imaginary Bentley thus: "Now either you're just grossly incompetent or you're awful lazy, and we believe that it has to do with why you're number one on our corrupt list—is because we believe that this is corruption and cronyism tied to the mayor's race last year." Told that Bentley's sister had called in to complain that her brother was being slandered, Bunton replied: "I'm not slandering her brother because the fact of it is to be slander it has to not be true. . . . Unfortunately, your brother is corrupt. He is the most corrupt elected official in Anderson County, in my opinion."

On one occasion, Gates seemed to join Bunton in his accusations against Bentley. The videotape of the December 26, 1996 "Q&A" program shows Bunton stating:

> There's judges in this town that says their kids come home from school and say, "Daddy, the kids at school are saying you're corrupted." Well, I'm sorry that Judge Bentley's children [he has four] say that to him. But you know

16. See note 13, *supra*.

what? He is corrupted, and it's a shame that your parents disgrace you like that. And they can change. All they gotta do is do right. But Judge Bentley's been caught big-time....

Bunton and Gates, together, then listed occurrences that showed Bentley was corrupt:

BUNTON: Bascom Bentley is exactly the same way. He is corrupt. The Curbo deal does it. The Neal deal does it. I mean it's one thing after another:—

GATES: Clarence George Gray [who had not previously been mentioned], Gerald Battles [the criminal defendant Gates had advised the day Gates met with Bentley in chambers]—

BUNTON: —Clarence Gray, Gerald—

GATES: —and there's some others besides—

BUNTON: —and there's others.

GATES: —Gerald Battles.

BUNTON: And it's broken a lot of people's belief that Bascom Bentley is a shining star of Anderson County. But let me tell you what: Bascom Bentley is the most corrupt elected official other than maybe [District Attorney] Jeff Herrington.

On February 6, 1996, Bentley sued Bunton, Gates, and others associated with "Q&A". The case came to trial a year later. At trial, Gates admitted that he never had any knowledge that Bentley was corrupt or criminal, but Bunton continued to assert that Bentley was both corrupt— by which he testified he meant dishonest, unethical, shady, and unscrupulous, as the

word is commonly defined [17]—and criminal. To prove that his accusations of corruption and criminal conduct were in fact true, Bunton testified to the six matters that had been discussed on various Q&A programs—the Curbo and Neal cases, the Harding warrant, the political contributions, and the several failures to oversee county officials and to report judicial misconduct—and to two other cases in which Bentley had revoked a criminal defendant's probation—that of Rory Beavers in one and Nathan Meyer in the other—and another judge had granted a new trial. Bentley testified at length, reviewing the details of these assertions and explaining how his conduct had been proper. Bentley also offered expert testimony by Cindy Garner, the district attorney in neighboring Houston County, and Sam Hicks, Curbo's lawyer. The evidence regarding all eight matters asserted by Bunton to show that Bentley was corrupt may be fairly summarized as follows:

- *The Curbo case.* Although it is unusual for a court to release a defendant on personal recognizance pending a hearing on a motion to adjudicate guilt following a probation violation, it is clearly within a court's discretion to do so.[18] A hearing on the motion was postponed by agreement of the district attorney and Hicks to give the boy a chance to mend his ways before facing incarceration. The agreement was not in writing, and Bunton was not aware of it because he did not talk with the district attorney or Hicks, which he could have done. Hicks testified that the pen-

---

17. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY at 512 (1961) (defining "corrupt" as "depraved, evil: perverted into a state of moral weakness or wickedness", "of debased political morality: characterized by bribery, the selling of

political favors, or other improper political or legal transactions or arrangements").

18. *See* TEX.CODE CRIM. PROC. arts. 17.03, 17.031, 17.04.

dency of the motion was to Curbo's benefit and could not reasonably have been construed as an effort to coerce Curbo's father in any way.

- *The Harding warrant.* Bentley was not involved in any way in either the issuance or the recall of the warrant for Harding's arrest, and he had no duty to have the sheriff arrested for not executing the warrant or to convene a court of inquiry.
- *The "hot check" and forfeited property funds.* Although for a time the district attorney did not deposit payments made by defendants on hot checks and forfeited property funds in the county treasury as required by law,[19] the mistake was thoroughly investigated and no wrongdoing was found. Garner testified that Bentley had nothing to do with these funds and was not required by law to force the county auditor or the commissioners court to take remedial action sooner.
- *The petitions to remove the district attorney.* Bunton filed two petitions to remove the district attorney. After an investigation, both were dismissed, one by Judge Calhoon and the other by Judge Bournias. Bentley had nothing to do with either petition, and he was not required to report Judge Calhoon and Judge Bournias to the Judicial Conduct Commission for acting illegally. On the contrary, neither petition had merit; both were found to have been based on personal vendettas, unfounded rumors, and a lack of knowledge of the criminal justice system.
- *Bentley's campaign contributions.* After a runoff primary election for county judge, Bentley contributed $100 to both the winner and the loser. The winner was not opposed in the general election. Bentley's campaign treasurer received oral approval for such contributions from the Texas Ethics Commission.
- *The Neal, Meyer, and Beavers cases.* In each of these criminal cases, Bentley's rulings were set aside. In the Neal case, Bentley erroneously attempted to issue an order nunc pro tunc correcting a sentencing order that failed to recite the plea bargain that the defendant would not be given "good time" credit. Neal was ordered released. In the Meyer case, the defendant's lawyer misunderstood Bentley to say that he would not grant a motion to revoke probation and therefore did not offer evidence. When Bentley denied the motion, Meyer moved for a new trial, and Bentley recused. Judge Calhoon ordered that Meyer be given a new trial. In the Beavers case, after sentencing the defendant, Bentley recused, and another judge granted the defendant a new trial. None of the cases involved anything other than at most an error of law by Bentley. Garner testified that it would not be reasonable for anyone to conclude that Bentley was corrupt on account of his handling of the Neal case, and Judge Calhoon testified to the same effect regarding the Meyer case.

Bentley acknowledged at trial that he had not incurred any monetary loss as a result of Bunton's and Gates's conduct, but he offered evidence regarding the injury to his reputation and the mental stress he

---

**19.** *See id.* arts. 59.06 ("Disposition of Forfeited Property"), 103.004 ("Disposition of Collected Money").

had suffered. Bunton and Gates, he testified,

> have taken time from me. They have ruined moments with my family, with my friends. They have—they have put a cloud over my home, my four children. And Jackie Gates, yes, sir, Mr. Gates—perhaps even more than Mr. Bunton—they have—I have—I have agonized because my name means something to me.... In a lot of ways, it's all I've got, and I've—the day I became judge, I appreciated that I had a position of trust, and that of all people I needed to maintain my integrity and try to be a virtuous man. I've got four children that I don't want embarrassed, and every time Mr. Gates or the rest of them opened their mouth, I know how it hurt them, how it hurt my sister, how it hurt my family.

Bentley testified that the accusation against him had been "the worst thing that's happened to me in my life", going "to the very heart of what my whole life is about." Everywhere he went, he said, people would say that they had heard him called corrupt, although "most of them are well-meaning and a lot of them said it was joking". Bentley testified that he spent time worrying at home about the accusations, and that he worried about the effect on his family and the treatment of his children by their peers at school. Bentley's wife testified that the entire episode had been a "tragedy" that had "ruined Bascom's life and my children's life". Her husband, she said, had lost sleep, suffered stress, and would never be the same. A long-time friend of Bentley's testified:

> Well, I think it's impacted him a lot. I've known him, like I said, for fifteen or twenty years, and I think—I think he's been downcast. I think he's been depressed and he's been sad. It's unfortunate, but I've seen a major change in the

demeanor of the judge. I don't know what else I can say, but it's kinda sad the way it has affected him and his family as well.

When Bentley rested his case-in-chief, the court directed a verdict for all of the defendants except Bunton and Gates. At the close of all of the evidence, the trial court granted Bentley's motion for a partial directed verdict that Bunton's accusations of corruption and criminality were defamatory per se. The jury then found that:

- Bunton published defamatory statements about Bentley with "actual malice" and with "malice";

- Gates agreed with Bunton's defamatory statements and published his agreement with "actual malice" and with "malice";

- Bunton and Gates conspired to publish defamatory statements about Bentley;

- Bunton's conduct caused Bentley to suffer $150,000 damages in past and future loss of character and reputation, and $7 million in past mental anguish;

- Gates's conduct caused Bentley to suffer $25,000 damages in past loss of character and reputation and $70,000 in past mental anguish; and

- punitive damages should be assessed, $1 million against Bunton and $50,000 against Gates.

Based on this verdict, the trial court rendered judgment awarding Bentley actual and punitive damages and prejudgment interest totaling $9,560,410.40 against Bunton and $163,739.72 against Gates. The trial court refused to hold the defendants jointly liable for all of the damages, despite the jury's finding that they had conspired to defame Bentley.

Bunton and Gates appealed from the judgment against them, and Bentley appealed from the denial of joint liability. The court of appeals affirmed the judgment against Bunton but reversed the judgment against Gates.[20] The court concluded that:

- the jury's finding that Bunton acted with actual malice was supported by clear and convincing evidence;[21]
- Bunton had the burden of proving that his statements were true, and failed to do so;[22]
- the jury's findings of actual damages caused by Bunton were supported by legally and factually sufficient evidence;[23]
- there is no evidence that Gates defamed Bunton;[24] and
- Bunton and Gates were not jointly liable as co-conspirators because Bentley did not request a jury finding on what damages were caused by the conspiracy itself and the evidence did not conclusively establish that all of the damages Bunton caused were attributable to the conspiracy, such as damages resulting from statements made before the conspiracy was formed and never ratified by Gates.[25]

Bentley and Bunton petitioned for review, and we granted both petitions.[26] They, along with respondent Gates, have raised numerous issues. We begin (in Part II) with the defendants' threshold claim that the Texas Constitution affords them greater protection than the First Amendment. We then consider the issues related to liability: whether the defendants' statements were capable of defamatory meaning (Part III), whether those statements were false (Part IV), and whether the defendants acted with actual malice (Part V). Next we turn to the issues related to damages (Part VI). Finally, we consider the appropriate action in light of our conclusions (Part VII).

## II

Bunton and Gates claim the protections of article I, section 8 of the Texas Constitution, as well as those of the First Amendment to the United States Constitution. Article I, section 8 states:

Freedom of speech and press; libel

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.[27]

Both defendants point out that this Court has sometimes called the state guarantee of free speech "broader",[28] but neither of

---

**20.** —— S.W.3d —— (Tex.App.-Tyler 1999).

**21.** *Id.* at ——.

**22.** *Id.* at ——.

**23.** *Id.* at ——.

**24.** *Id.* at ——.

**25.** *Id.* at ——.

**26.** 44 Tex. Sup.Ct. J. 196–197 (Dec. 21, 2000).

**27.** TEX. CONST. art. I, § 8.

**28.** *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 116 (Tex.2000) ("we have recognized that the Texas Constitution's free speech guarantee is in some cases broader than the federal guarantee"); *Commission for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 434 (Tex.

them explains how differences in the two constitutional provisions affect this case. The mere assertion that the state provision is broader than the federal means nothing. As we said in *Commission for Lawyer Discipline v. Benton:*

> This Court has recognized that "in some aspects our free speech provision is broader than the First Amendment." However, to assume automatically "that the state constitutional provision *must* be more protective than its federal counterpart illegitimizes any effort to determine state constitutional standards." If the Texas Constitution is more protective of a particular type of speech, "it must be because of the text, history, and purpose of the provision."[29]

Bunton and Gates make no attempt to show how the text, history, or purpose of the state constitutional provision affords them greater protection than the First Amendment.

■ If anything, in the context of defamation, the First Amendment affords more protection. Recently, in *Turner v. KTRK Television, Inc.,* we explained:

> Although we have recognized that the Texas Constitution's free speech guarantee is in some cases broader than the federal guarantee, we have also recognized that "broader protection, if any,

cannot come at the expense of a defamation claimant's right to redress." Unlike the United States Constitution, the Texas Constitution expressly guarantees the right to bring reputational torts. The Texas Constitution's free speech provision guarantees everyone the right to "speak, write or publish his opinions on any subject, *being responsible for abuse of that privilege.*" Likewise, the Texas Constitution's open courts provision guarantees that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person *or reputation,* shall have remedy by due course of law." While we have occasionally extended protections to defamation defendants greater than those offered by the United States Constitution, we have based these protections on the common law, not the Texas Constitution.[30]

As CHIEF JUSTICE PHILLIPS correctly stated several years ago, after thoroughly reviewing the history of article I, section 8, "[N]othing in the language or purpose of the Texas Free Expression Clause authorizes us . . . to afford greater weight in the balancing of interests to free expression than we would under the First Amendment. . . ."[31]

---

1998) ("This Court has recognized that 'in some aspects our free speech provision is broader than the First Amendment.' "); *Cain v. Hearst Corp.,* 878 S.W.2d 577, 584 (Tex. 1994) ("this Court [has] recognized that in some aspects our free speech provision is broader than the First Amendment"); *Ex parte Tucci,* 859 S.W.2d 1, 5 (Tex.1993) (" 'article one, section eight . . . provides greater rights of free expression than its federal equivalent' "); *Davenport v. Garcia,* 834 S.W.2d 4, 8 (Tex.1992) ("we have recognized that in some aspects our free speech provision is broader than the First Amendment"); *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989) ("our state free speech guarantee may be broader than the corresponding federal guar-

antee"); *O'Quinn v. State Bar of Tex.,* 763 S.W.2d 397, 402 (Tex.1988) ("it is quite obvious that the Texas Constitution's affirmative grant of free speech is more broadly worded than the first amendment's proscription of Congress from abridging freedom of speech").

**29.** 980 S.W.2d at 434 (citations omitted, emphasis in original).

**30.** 38 S.W.3d at 116–117 (citations omitted, emphasis in original).

**31.** *Tucci,* 859 S.W.2d at 32 (Phillips, C.J., concurring).

■ In some cases we have applied state constitutional provisions before considering similar provisions of the federal constitution,[32] but in others we have not.[33] No rigid order of analysis is necessary, despite occasional language to the contrary in some of our opinions.[34] Where, as here, the parties have not argued that differences in state and federal constitutional guarantees are material to the case, and none is apparent, we limit our analysis to the First Amendment and simply assume that its concerns are congruent with those of article I, section 8.

### III

We now turn to Bunton's and Gates's arguments that their statements were expressions of opinion rather than statements of fact and were not capable of defamatory meaning.

### A

■ It is well settled that "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements."[35] This is also true in determining whether a publication is an actionable statement of fact or a constitutionally protected expression of opinion.

■ To distinguish between fact and opinion, we are bound to use as our guide the United States Supreme Court's latest word on the subject, *Milkovich v. Lorain Journal Co.*[36] In that case a newspaper, the *Lorain Journal,* reported that a high school wrestling coach, Milkovich, had "lied" during a judicial proceeding which overturned a state athletic association's sanction imposed on his team. The Court rejected the newspaper's argument that its statements were constitutionally protected opinion. The Court began its analysis by explaining that early common law did not distinguish between factual statements and opinions in imposing liability for defamation, but

> due to concerns that unduly burdensome defamation laws could stifle valuable public debate, the privilege of "fair comment" was incorporated into the common law as an affirmative defense to an action for defamation. "The principle of 'fair comment' afforded legal immunity for the honest expression of opinion on matters of legitimate public interest when based upon a true or privileged statement of fact."[37]

After surveying the constitutional limitations on defamation liability in its own opinions, the Court concluded that it was unnecessary to create a separate privilege for "opinion" defined by some multi-factor test, as some courts had done.[38] "[W]e

**32.** *E.g., HL Farm Corp. v. Self,* 877 S.W.2d 288, 290 (Tex.1994); *R Communications, Inc. v. Sharp,* 875 S.W.2d 314, 315 (Tex.1994); *Tucci,* 859 S.W.2d at 5 (plurality opinion).

**33.** *E.g., Commission for Lawyer Discipline,* 980 S.W.2d at 429–430; *Operation Rescue v. Planned Parenthood, Inc.,* 975 S.W.2d 546, 556 (Tex.1998); *Tilton v. Marshall,* 925 S.W.2d 672 (Tex.1996); *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440 (Tex. 1993).

**34.** *See, e.g., Davenport,* 834 S.W.2d at 17–18.

**35.** *Turner,* 38 S.W.3d at 115.

**36.** 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *cf. Carr v. Brasher,* 776 S.W.2d 567, 570 (Tex.1989) (noting at that time that the United States Supreme Court had not provided guidance on the issue).

**37.** 497 U.S. at 13, 110 S.Ct. 2695.

**38.** *See, e.g., Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc) (announcing a four-part test for distinguishing assertions of fact from expressions of opinion); *see also* Robert D. Sack, *Protection of Opinion Under the First Amendment: Reflections on Alfred Hill, "Defamation and Privacy Under the First Amend-*

think the ' " 'breathing space' " ' which ' " '[f]reedoms of expression require in order to survive,' " ' " the Court said, "is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and fact." [39] Included in that doctrine, the Court explained, are the following principles:

- "a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved" and "where public-official or public-figure plaintiffs [are] involved;" [40]

- the Constitution protects "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" made in debate over public matters in order to "provide[ ] assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our Nation;" [41]

- "where a statement of 'opinion' on a matter of public concern reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth", and "where such a statement involves a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some level of fault"; [42] and

- "the enhanced appellate review required by *Bose Corp. [v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ]* provides assurance that the foregoing determinations will be made in a manner so as not to 'constitute a forbidden intrusion of the field of free expression.' " [43]

How these principles apply in a given case are, of course, questions of law.[44]

■ The analysis prescribed by *Milkovich* supplants various proposed dichotomies between fact and opinion. For example, more than a decade before *Milkovich,* section 566 of the *Restatement (Second) of Torts* set out a rule making a statement of

*ment"*, 100 Colum. L.Rev. 294, 323–325 (2000); *cf. Carr,* 776 S.W.2d at 570 (noting but not applying the *Ollman* factors).

39. 497 U.S. at 19, 110 S.Ct. 2695 (quoting *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 772, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964))).

40. *Id.* at 19–20, 20 n. 6, 110 S.Ct. 2695 (citing *Hepps,* 475 U.S. at 779, 106 S.Ct. 1558).

41. *Id.* at 20, 110 S.Ct. 2695 (citing *Greenbelt Coop. Pub. Ass'n, Inc. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); and *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)).

42. *Id.* (citing *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Pub. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion); and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)).

43. *Id.* at 21, 110 S.Ct. 2695.

44. *Id.* at 19–21, 110 S.Ct. 2695; *see Carr,* 776 S.W.2d at 570; *see also* Robert D. Sack, Sack on Defamation § 4.3.7, at 4–54 (3d ed. 2002) ("The vast majority of courts, and all of the federal circuits, agree that whether a statement is fact or opinion is a matter of law for the court to decide.").

opinion actionable "only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."[45] Six years before Milkovich, *Prosser and Keeton on Torts* proposed a three-part classification of opinions as either deductive, evaluative, or informational.[46] About the same time, the United States Court of Appeals for the District of Columbia Circuit in *Ollman v. Evans* designed a four-part test for distinguishing between fact and opinion.[47] In lieu of such distinctions, *Milkovich* focuses the analysis on a statement's verifiability and the entire context in which it was made.[48]

With this direction, we examine the evidence in this case.

## B

Bunton referred to Bentley's actions as "criminal" only once, which was during the June 6 "Q&A" broadcast. After describing the Curbo case, in which he faulted Bentley for having released the defendant on a personal bond and delayed final adjudication, Bunton suddenly exclaimed: "y'all"—referring to Bentley and Sheriff Hubert—"are corrupt, y'all are the criminals, y'all are the ones that oughta be in jail." Nothing that preceded this statement would have led a reasonable person to think that Bunton was asserting that Bentley had actually committed a crime. Bunton barely alluded to the theory he later espoused that Bentley had handled the case in a way to pressure the defendant's father, which, if true (it was not), would undoubtedly have been criminal. All Bunton said on this subject during the June 6 program was that Bentley should "quit hanging [the case] over these people's heads". By itself, Bunton's single, excited reference to Bentley as a "criminal" might be taken to be rhetorical hyperbole, although hardly of any sort that, in the words of *Milkovich*, "has traditionally added much to the discourse of our Nation."[49] In context, however, Bunton's characterization of Bentley's conduct as criminal is only part of Bunton's efforts over many months to prove Bentley corrupt.

■ By calling Bentley "corrupt", Bunton testified that he intended the word's ordinary meaning—dishonest, unethical, shady, and unscrupulous—and we think that is what any reasonable viewer would have understood. While the word may be merely epithetic in the context of amorphous criticism,[50] it may also be used as a

---

**45.** RESTATEMENT (SECOND) OF TORTS § 566 (1977).

**46.** W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 113A, at 813–814 (5th ed. 1984).

**47.** 750 F.2d 970 (D.C.Cir.1984) (en banc); *cf. Carr v. Brasher*, 776 S.W.2d 567, 570 (Tex. 1989) (noting but not applying the *Ollman* factors).

**48.** *See* RODNEY A. SMOLLA, LAW OF DEFAMATION § 6.12[1] at 6.44–6.47 (2d ed. 2001); BRUCE W. SANFORD, LIBEL & PRIVACY § 5.3.2, at 148–149 (2d ed. 2001).

**49.** 497 U.S. at 20, 110 S.Ct. 2695 (citation omitted).

**50.** *See, e.g., 600 West 115th St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 589 N.Y.S.2d 825, 603 N.E.2d 930, 937 (1992) (concluding that statement made at public hearing on a building permit application that the plaintiff's conduct " 'is as fraudulent as you can get and it smells of bribery and corruption' " was merely opinion, given the lack of factual specificity and the tenor of its presentation, a "rambling, table-slapping monologue" and "angry, unfocused diatribe"); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299, 1306–1308 (1977) (suggesting that statements that a judge was "probably corrupt" were opinions that had not been proven factually false); *Maynard v. Daily Gazette Co.,* 191 W.Va. 601, 447 S.E.2d 293, 299 (1994) (holding that editorial stating that college athletic director's conduct was

statement of fact that can be proved true or false,[51] just like the word "liar" applied to Coach Milkovich. Examples abound. When the Athenian court accused Socrates of corrupting the minds of the young, it intended to indict, not merely insult.[52] Corrupt conduct, determined as a matter of fact, may be punished under Texas law in numerous situations.[53] Accusing a public official of corruption is ordinarily defamatory *per se*. As *Prosser and Keeton on the Law of Tort* states: "it is actionable without proof of damage to say of a ... public officer that he has ... used his office for corrupt purposes ... since these

things obviously discredit [one] in his chosen calling."[54] Consistent with this rule, we held in *A.H. Belo & Co. v. Looney* that detailed accusations of corruption against a public official are not protected opinion, explaining:

"There is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the ... character of a public man, and to ascribe to him base and corrupt motives, he must do so at

part of the "corruption of college athletics" did not actually accuse the director of corruption and was thus merely opinion); *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1445 (8th Cir.1989) (holding that author's quotation of an attorney calling an FBI agent "corrupt and vicious" was unverifiable opinion); *Silvester v. American Broad. Cos.*, 650 F.Supp. 766, 772 (S.D.Fla.1986) (holding that an unspecific claim that " 'jai alai is a totally corrupt industry' " was "a statement of opinion ... too general to support an action for libel"); *cf. Greenbelt Coop. Pub. Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (concluding that accurate newspaper reports of heated debates before city council in which the plaintiff's negotiating efforts were criticized as "blackmail" could not have been reasonably understood by any reader to refer to the commission of a crime).

51. *See, e.g., Moore v. Leverett*, 52 S.W.2d 252, 255 (Tex. Comm'n App.1932, holding approved) ("To make a statement that a public officer is actuated by evil or corrupt motives in a public undertaking is to make a statement of fact which should be justified like any other statement of fact in order to exonerate the person making the statement."); *Silsdorf v. Levine*, 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716, 720–721 (1983) (holding that accusations of "corruptness" in an open letter were not merely opinion because they purported to be factual); *Kelly v. Schmidberger*, 806 F.2d 44, 49 (2d Cir.1986) (stating that assertions of mishandling church property were factual, suggesting corrupt or criminal conduct, and were therefore actionable).

52. Plato, Socrates' Defense 24b (in The Collected Dialogues of Plato 10 (edited by Edith Hamilton and Huntington Cairns, Pantheon Books 1961)) ("Socrates is guilty of corrupting the minds of the young, and in believing in deities of his own invention instead of the gods recognized by the state. Such is the charge.").

53. *See, e.g.,* Tex. Agric. Code § 59.003 (stating that a farm and ranch finance program board member may be liable for an official act or omission that is corrupt); Tex. Civ. Prac. & Rem.Code § 171.088(a) (stating that an arbitration award may be set aside if obtained by corruption or if an arbitrator was corrupt); Tex. Fin.Code § 12.106 (stating that an employee of the banking department is not liable for an official act or omission unless it is corrupt); *id.* § 14.055 (same for an employee of the consumer credit commission); *id.* § 89.006 (same for an employee of the savings and loan department); Tex. Gov't Code § 52.024 (stating that the court reporter certification board may refuse to certify an applicant convicted of a crime involving corruption); *id.* § 52.029(a) (stating that a court reporter may be sanctioned for corruption); Tex. Loc. Gov't Code § 22.077(a) (stating that a municipal officer may be removed for corruption).

54. W. Page Keeton et al., Prosser & Keeton on the Law of Torts § 112, at 791–792 (5th ed.1984).

his peril; and must either prove the truth of what he says, or answer in damages to the party injured." [55]

Although *Looney*'s allocation of the burden of proof is no longer correct,[56] in other respects the opinion appears to express the sentiment of most courts. The Maryland Supreme Court has observed:

> The greater number of Courts have held that the imputation of a corrupt or dishonorable motive in connection with established facts is itself to be classified as a statement of fact and as such not to be within the defense of fair comment.[57]

■ Whether Bunton's repeated accusations that Bentley was corrupt were statements of fact or expressions of opinion depends, according to *Milkovich*, on their verifiability and the context in which they were made. As the court in *Ollman* stated: "It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service." [58] But much ground lies between these two extremes. While "Q&A" certainly never delivered anything approaching a research monograph on Bentley's conduct in office, and Bunton's ravings were often classic soapbox oratory, Bunton plainly and repeatedly stated that his accusations of corruption were based on actual fact. He cited specific cases and occurrences and pointed to court records and public documents. He claimed to have made lengthy investigations and interviewed courthouse employees and others. It had been hard, he told a friend and one

viewer who called in to the program, to find a basis for accusing Bentley. He claimed to have looked into the law pertaining to personal bonds, case disposition guidelines, judicial ethics, the sheriff's responsibilities, and the district court's supervisory responsibility over the county auditor and county commissioners court. When challenged by viewers who called in, Bunton refused to argue about whether Bentley was a good or bad judge or person; on the contrary, he told one caller that Bentley's personal character was irrelevant. Bunton constantly insisted that his charges were borne out by objective, provable facts. Indeed, he invited Bentley to appear on the show, not to debate the issues, but to answer the factual allegations and disprove that he was corrupt. It is true that Bunton often also said that it was his opinion that Bentley was corrupt. But as the Supreme Court explained in *Milkovich*:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated:

**55.** 112 Tex. 160, 246 S.W. 777, 783 (1922) (quoting *Negley v. Farrow*, 60 Md. 158 (1883)).

**56.** See note 62, *infra*.

**57.** *A.S. Abell Co. v. Kirby*, 227 Md. 267, 176 A.2d 340, 343 (1961) (citing PROSSER ON TORTS

622 (2d ed.1955) and THAYER, LEGAL CONTROL OF THE PRESS § 66 (3d ed.1956)), cited in SACK, *supra* note 44, § 4.3.6, at 4–52 n. 220.

**58.** *Ollman v. Evans*, 750 F.2d 970, 983 (D.C.Cir.1984) (en banc).

"[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" See *Cianci* [*v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir., 1980)]. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, § 566, Comment *a* (1977).[59]

Furthermore, Bunton repeatedly insisted that evidence he had seen but had not disclosed supported his assertions. He had reviewed many public records, he said, and talked with courthouse employees. Much other information was publicly available, he continually assured viewers, to substantiate Bentley's corruption in office. He encouraged callers to investigate this information for themselves and to report other misconduct that he strongly suggested could be found for the looking. Even under the common law rule stated in section 566 of the *Restatement (Second) of Torts* (to which *Milkovich* referred) that requires an implication of undisclosed facts for an opinion to be actionable, Bunton's statements were defamatory.

Throughout the trial, Bunton insisted that his statements that Bentley was corrupt were verifiably true and could be proved. Bunton's attorney told the jury in his opening statement:

We're going to prove the truth of each and every statement, or we're going to prove that there was an investigation in an attempt to learn the truth, the truth was concealed. There was no disregard for the truth. There was an attempt to get it.

During the presentation of the evidence, Bunton identified eight discrete instances that he said showed Bentley's corrupt conduct in office. He cited to details himself, and attempted to elicit factual and expert testimony from other witnesses, not merely to substantiate his personal opinions, but to prove his statements true. In his summation, Bunton's attorney went over each instance on which Bunton had based his charges of corruption and attempted to show how they had been proved true. Bunton's consistent position at trial that his accusations of corruption were true is a compelling indication that he himself regarded his statements as factual and not mere opinion, right up until the jury returned its verdict.

■ An important part of the context of the defendants' statements here is that they were made on public access television. Federal law permits local authorities to require cable television operators to provide public access channels.[60] Commenting on that law, a committee of the U.S. House of Representatives observed:

Public access channels are often the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet. They provide groups and individuals who generally have not had access to the electronic media with the opportunity to become sources of information in the electronic marketplace of ideas. [Public, educational, and governmental] channels also contribute to an informed citizenry by bringing local schools into the home, and by showing the public local government at work.[61]

---

**59.** *Milkovich,* 497 U.S. at 18–19, 110 S.Ct. 2695.

**60.** 47 U.S.C. § 531.

**61.** *Report of the Committee on Energy and Commerce on the Cable Franchise Policy and Communications Act of 1984,* H.R.Rep. No. 98–934, at 30 (1984), *reprinted in* 1984

Public access programming is not network news. Usually, it is informal and is not professionally scripted or produced. It often does not project the credibility that other television broadcasts have. "Q&A" was in this mold—in Bunton's words, "a wide-open, sometimes caustic and/or an uncivilized public forum". Bunton's accusations on "Q&A" must be considered in that context. By the same token, however, statements are not incapable of defamation or absolutely protected from liability merely because they are made on public access television. A soap box, electronic or wooden, does not lift a speaker above the law of liability for defamation. Besides, as the congressional committee noted, public access television is not only a "soap box" forum but also provides educational and governmental information.

The clear import of Bunton's statements on "Q&A" was that Bentley was corrupt as a matter of verifiable fact, as Bunton continued to assert at trial. Accordingly, we reject Bunton's argument on appeal that his accusations of corruption were constitutionally protected opinion.

### C

 Gates also argues that his own comments on two "Q&A" programs were opinion and in any event were not capable of defamatory meaning.

The videotapes of "Q&A" program excerpts played at trial showed Gates and Bunton sitting side by side numerous times while Bunton asserted that Bentley was corrupt. For the most part, Gates exhibited no reaction to Bunton's statements, but on two programs Gates seemed to express his agreement with Bunton's statements that Bentley was corrupt. On one occasion, Gates attempted to correct

Bunton's misstatement to a caller that district attorney Herrington was the most corrupt official in Anderson County. Bunton interrupted that Bentley was "number one", and Gates replied, "Yeah." On the other occasion, Bunton stated that "one thing after another" showed that Bentley was corrupt, citing two situations he had previously described. Gates then named two other situations, adding "and there's some others besides." At trial, Gates explained that he did not intend to express agreement with Bunton on either occasion. The first time, Gates said, his "yeah" was merely an acknowledgment that Bunton had corrected himself. In Gates's words: "I think it was a spontaneous reaction more than anything, is all I can say." The second time, Gates explained, he was merely helping Bunton list the examples Bunton had cited without meaning to endorse any of them himself.

The jury did not believe Gates; rather, they found that "Jackie Gates agreed with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt". The jury saw Gates on the videotaped programs and on the witness stand, and they were entitled to judge his credibility by his demeanor and testimony. Even if we assume that Gates's "yeah" on the one occasion was ambiguous, the jury could reasonably conclude that on the second occasion when Gates not only appeared to concur in Bunton's assertions but listed examples of his own, examples which Bunton had not mentioned but immediately endorsed, Gates was expressing his agreement with Bunton's defamatory statements.

The jury was not, of course, entitled to base their conclusion simply on Gates's

U.S.C.C.A.N. 4655, 4667, *and cited in Denver Area Educ. Telecomm. Consortium, Inc. v. Federal Communications Comm'n,* 518 U.S.

727, 734, 739, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996).

and Bunton's joint appearances on "Q&A" programs. We do not suggest for a moment that a talk show host is liable for a guest's statements to which the host does not voice objection. The mere fact that people appear together is no evidence that they agree; on the contrary, television interviews more often than not indicate nothing about the host's views, much less the broadcaster's. But the jury had much more than mere joint appearances to support their finding. The jury could reasonably have determined that Gates was not being truthful in discounting his statement since he had been present on many "Q&A" programs when Bunton accused Bentley of corruption and had never protested, even though he testified that he told Bentley that he was joining "Q&A" to discourage Bunton from continuing to make the accusations. The evidence permitted the jury to find that Gates did not merely hold Bunton's coat at the stoning of Bentley, but threw rocks himself.

Judging Gates's words from the perspective of a reasonable listener, as we must, we conclude that they could easily have been considered defamatory as the jury found.

## IV

Next, we consider Bunton's and Gates's arguments that their statements were not false.

## A

 Bunton and Gates contend that Bentley has the burden of proving that they made false statements about him because he is a public official and also because they are media defendants. We agree that to recover for defamation, a public official like Bentley must prove that defamatory statements made about him were false.[62] Accordingly, we need not consider whether Bunton and Gates's use of public access television casts them as "media defendants" or whether, if it did, a plaintiff against them who was not a public figure would also be required to prove falsity.[63] The court of appeals erred in holding that the defendants were required to prove as an affirmative defense that

---

**62.** *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (requiring that a public figure or public official prove falsity); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 117–120 (Tex. 2000). *See also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (stating that if the defamatory speech is of public concern and the defendant is a member of the media, the plaintiff has the burden of proving falsity, but reserving the question of who has the burden if the defendant is not a member of the media); *Milkovich v. Lorain Journal, Co.*, 497 U.S. 1, 19–20, 20 n. 6, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (same); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990) (applying *Hepps*, 475 U.S. at 787, 106 S.Ct. 1558). *Cf. Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995) ("In suits brought by private individuals, truth is an affirmative defense to slander."); TEX. CIV. PRAC & REM. CODE § 73.005 ("The truth of the statement in

the publication on which an action for libel is based is a defense to the action."); SACK, *supra* note 44, § 3.3.2.2, at 3–9 to 3–12 (3d ed. 2001) (stating that the plaintiff may have the burden of proving the falsity of a statement of public interest even if the defendant is not a member of the media, but that the common law rule that truth is a defense to be pleaded and proved by the defendant may apply in cases where the speech is about a nonpublic subject); SMOLLA, *supra* note 48, § 5.07 at 5.11–.13 (2d ed. 2001) (stating that the assignment of the burden of proof of falsity is an unresolved question in many contexts); BRUCE W. SANFORD, LIBEL & PRIVACY § 6.3–6.3.3, at 213–219 (2d ed. 2001).

**63.** *See* Sack, *supra* note 38, at 326–327 (stating that the burden of proof on a plaintiff who is not a public official or a public figure suing media defendants is an open question, and citing cases).

their statements were true.[64] We have not required proof of falsity to be by more than a preponderance of the evidence,[65] and neither has the United States Supreme Court.[66] If the evidence is disputed, falsity must be determined by the finder of fact.

▮ In this case, the trial court refused Gates's request to inquire of the jury whether statements about Bentley were false. The court appears to have been of the view that the issue was subsumed in Bentley's motion for a partial directed verdict that Bunton's statements were defamatory per se, even though the falsity of those statements was not mentioned in the argument or ruling on the motion. That a statement is defamatory—that is, injurious to reputation—does not mean that it is false, and vice versa. After the verdict was returned, the defendants argued that the issue of falsity had not been raised by Bentley's motion. The court disagreed, reciting in its judgment that by granting Bentley's motion it had "ruled as a matter of law that [Bunton] had published false and defamatory statements about [Bentley] by accusing him of being corrupt and a criminal."

The defendants argue that because the trial court denied them a jury finding on falsity and the evidence on that issue was disputed, they are entitled to a new trial. Bentley argues that no finding was necessary because the evidence conclusively established that the statements about him were false, as the trial court determined by granting his motion for partial directed verdict. Alternatively, Bentley argues that by finding that Bunton and Gates

acted with actual malice—that is, knowledge of, or reckless disregard for, the falsity of their statements—the jury implicitly found that their statements were false, and that implicit finding is supported by at least some evidence.

Strictly as a matter of logic, the jury's finding that Bunton and Gates acted with actual malice does not necessarily imply that the statements made were false, inasmuch as the jury could have believed, as they were instructed, that Bunton and Gates acted "with reckless disregard as to [the] *truth or* falsity" of the statements. As a practical matter, however, it is highly unlikely that the jury would have found that Bunton and Gates made true statements with actual malice—that is, with reckless disregard for whether the statements were true. Bentley's implied finding argument is therefore not without force. But we need not determine whether a finding of falsity can be implied from the verdict in this case because, as we explain below, Bentley proved conclusively that the statements that he was corrupt and criminal were false. Accordingly, we accept the trial court's statement in its judgment that it determined the issue as a matter of law.

**B**

▮ Bunton based his statements that Bentley was corrupt—by which Bunton meant dishonest, unethical, shady, and unscrupulous—on the eight situations we have already described in detail, and nothing else. Accordingly, the issue before us is whether Bentley proved without contradiction that none of those situations

---

**64.** —— S.W.3d at ——.

**65.** *Turner,* 38 S.W.3d at 117.

**66.** *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 661 n. 2, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)("There is

some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. We express no view on this issue." (citations omitted)).

showed that he was criminal or corrupt in any way. Without repeating unnecessarily the evidence we have already set out, we examine each of the eight bases Bunton has claimed for his accusations:

*The Curbo case:* First, Bunton suggested on the June 6, 1995 "Q&A" program that Bentley acted improperly in releasing Curbo without a surety bond, although Bunton now tells us in his brief that he "never made the allegation that the bond matter made Bentley corrupt." Bentley's action was authorized by statute,[67] and Curbo's attorney, Hicks, testified that there was nothing unusual about Curbo's release without bond. Next, Bunton asserted on various programs that Bentley delayed a final adjudication in the case to pressure Curbo's father in the event he was elected mayor. Bentley testified that he had no such motive, Hicks testified that the charge was "a load of bull", and in any event, Curbo's father was not elected mayor. Further, Bunton argues that the case should not have been delayed so long or at the request of the district attorney. Bentley and Hicks testified that the delay was proper and benefitted Curbo by giving him one last chance to correct his ways. Their testimony was supported by letters in the court file from Curbo's probation officer. There was no evidence that delay was improper. Finally, Bunton makes two arguments he did not raise at trial: that Bentley had improper ex parte discussions with Curbo's probation officer, and that it was illegal for the district attorney and Curbo's attorney to revise the terms of Curbo's probation. There is no evidence to support either argument; on the contrary, Hicks testified that Bentley did "absolutely nothing" improper in handling the Curbo case, and that the charge that Bent-

ley's conduct in the case was corrupt was "a lie."

*The Harding warrant:* Bunton asserts that Bentley had a legal duty to require the sheriff to execute an arrest warrant that Bentley did not issue and that the district attorney caused to be withdrawn. Bentley testified that he was not connected with the incident in any way, and as a matter of law, he had no legal duty to require the sheriff to execute a warrant that had been withdrawn.

*The "hot check" and confiscated property funds:* Bunton contends that if Bentley had properly supervised the county auditor and the county commissioners court, they would have discovered sooner that the district attorney was not properly depositing the money that defendants paid on "hot checks" and the money obtained from property forfeitures in the county treasury as the law required, but was administering those funds himself. While district courts have general supervisory control over county commissioners courts,[68] there is no suggestion or claim that this jurisdiction was invoked, much less that any district court exercised it improperly. And while district courts in most counties, including Anderson County, have the power to appoint and remove a county auditor, under certain circumstances,[69] there is no evidence that Bentley or the other district judges in Anderson County exercised their authority improperly. On the contrary, Houston County District Attorney Garner, who investigated the handling of the funds, testified that Bentley had "nothing to do" with them, that there was "no possibility" that he could have been corrupt on account of the way they were handled, and that in fact there was no wrongdoing at all in connection with the funds, either on the

67. See note 5, *supra.*

68. See note 13, *supra.*

69. See note 15, *supra.*

part of Anderson County District Attorney Herrington or anyone else. No evidence contradicts Garner's testimony.

*The petitions to remove the district attorney:* Bunton complains that Bentley should have reported two of his colleagues, Judge Bournias and Judge Calhoon, for judicial misconduct in denying petitions Bunton filed to remove the district attorney. Bentley testified that he had nothing to do with either petition. Garner, who investigated the petitions, reported that there was no basis for them, and that they had been motivated entirely by personal vendettas, unfounded rumors, and a lack of knowledge of the criminal justice system. There is no evidence or authority that the rulings were incorrect, or that Bentley would have had a duty to report the judges even if they had ruled in error.

*Bentley's campaign contributions:* Bentley contributed to both the winner and loser of the runoff election in the Democratic primary for county judge of Anderson County, after that election was over. Bunton argues that the contributions were improper because the district judges supervise the county judge.[70] Bentley testified that his contributions were meant to help each candidate defray lingering expenses and were proper. Bentley volunteered that he would not have contributed to any opposed candidate. Bunton testified that even though the winning primary candidate had no announced opposition in the general election, the possibility of a write-in campaign remained. No such campaign occurred, and there is no evidence that it was ever more than an abstract possibility. There is no evidence or legal basis for thinking that Bentley's contributions were corrupt, even if they had been made to opposed candidates.

Moreover, Bentley's campaign treasurer testified that he received oral approval for the contributions from the Texas Ethics Commission. As a matter of law, Bentley's contributions were not improper, let alone corrupt.

*The Neal, Meyer, and Beavers cases:* Bentley's rulings in each of these three cases was determined to have been erroneous. In the *Neal* case, he improperly attempted to issue a nunc pro tunc sentencing order. District Attorney Garner testified that it was "totally unreasonable" to think that Bentley's conduct in the case was criminal or corrupt. In the *Meyer* case, Judge Calhoon ordered a new trial after Bentley revoked Meyer's probation, based upon counsel's asserted misunderstanding of Bentley's rulings. Judge Calhoon testified at trial that it "makes no sense" that anyone, even a layman, would "interpret[ ]", "interpolate[ ]", or "pull[ ] out" of his decision that Bentley was corrupt or criminal. In the *Beavers* case, Bentley testified that he had only made an error in judgment, and there was no other evidence regarding the case. As to all three cases, there was evidence that Bentley's actions were not criminal or corrupt, and no evidence that his rulings were dishonest or unethical. In each case, all that can be said is that Bentley was found, on ordinary review, to have committed an error in judgment. As one court has noted: "Where an official having discretion in a certain matter acts upon his judgment in good faith, although erroneously, such act is not corrupt".[71]

■ Bunton also contends that his statements about Bentley were taken out of context. The trial court admitted into evidence two videotapes containing about sixty minutes of "Q&A" broadcasts ex-

**70.** See note 13, *supra*.

**71.** *State v. District Court,* 206 Wis. 600, 240 N.W. 406, 409 (1932).

cerpted from twelve ninety-minute programs. One of the excerpts received in evidence was twenty-one minutes long, one was eleven minutes long, and three others were more than five minutes long. Bunton argues that the excerpts misleadingly lifted his statements out of context, but he does not explain how his assertions that Bentley was corrupt could have appeared less offensive if viewed as part of a longer broadcast. His only specific complaint is that Bentley did not offer in evidence the results of the "Q&A" viewer polls on whether he was corrupt. That omission does not make the videotapes misleading. Nothing about the excerpts themselves, which we have reviewed, indicates that they are misleading in any way. Moreover, Bunton did not offer into evidence tapes or transcripts of the entire programs that were excerpted or of other programs not shown at all that would cast his comments in a different light. Gates offered a videotape of one program that was excluded because it had not been timely produced during discovery. That tape is not in our record, and there is no indication that it would have shed a different light on the others. Bunton's argument that the broadcast excerpts were misleading simply has no support in the record, and therefore we reject it.

In sum, the evidence not only supports but conclusively establishes that Bunton's charges that Bentley was corrupt were utterly and demonstrably false as a matter of law. As Garner testified, in twelve years of practice she had never known Bentley to engage in any conduct that

could remotely be called criminal or corrupt. At trial, Gates did not disagree, and Bunton offered no evidence whatever to the contrary.

## V

Next, we consider Bunton's and Gates's arguments that they did not act with actual malice.

## A

In the seminal case of *New York Times Co. v. Sullivan*,[72] the United States Supreme Court held that to protect our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials,"[73] the First Amendment precludes a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice.[74] Since then, the Supreme Court has explained that "[t]he phrase 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will"[75]—common connotations of the word "malice" but rather is "a shorthand to describe the First Amendment protections for speech injurious to reputation".[76] Those protections for speech about a public official turn on the speaker's degree of awareness that the statements made are false. In the Supreme Court's words:

72. 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

73. *Id.* at 270, 84 S.Ct. 710.

74. *Id.* at 279–280, 84 S.Ct. 710. *See also Huckabee v. Time Warner Entertainment Co.,* 19 S.W.3d 413, 420 (Tex.2000).

75. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 666 n. 7, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). *See Huckabee,* 19 S.W.3d at 420.

76. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 511, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991).

Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.[77]

Thus, actual malice means knowledge of, or reckless disregard for, the falsity of a statement.[78]

 Knowledge of falsehood is a relatively clear standard; reckless disregard is much less so. Reckless disregard, according to the Supreme Court, is a subjective standard[79] that "focus[es] on the conduct and state of mind of the defendant."[80] It requires more than "a departure from reasonably prudent conduct."[81] Mere negligence is not enough.[82] There must be evidence " 'that the defendant in fact entertained serious doubts as to the truth of his publication,' "[83] evidence "that the defendant actually had a 'high degree of awareness of ... [the] probable falsi-

ty' "[84] of his statements. Thus, for example, the failure to investigate the facts before speaking as a reasonably prudent person would do is not, standing alone, evidence of a reckless disregard for the truth,[85] but evidence that a failure to investigate was contrary to a speaker's usual practice and motivated by a desire to avoid the truth may demonstrate the reckless disregard required for actual malice.[86] As the Supreme Court has observed, "Although courts must be careful not to place too much reliance on such factors [i.e., motive and care], a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."[87] "In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full."[88]

 While these concepts assist in understanding and applying the "reckless disregard" standard, the Supreme Court has cautioned that the phrase "cannot be fully encompassed in one infallible definition."[89] "The mental element of 'knowing

77. *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).

78. *New York Times v. Sullivan*, 376 U.S. at 279–280, 84 S.Ct. 710; *Huckabee*, 19 S.W.3d at 420.

79. *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678.

80. *Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

81. *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678; *Herbert*, 441 U.S. at 160, 99 S.Ct. 1635; *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

82. *Garrison*, 379 U.S. at 79, 85 S.Ct. 209.

83. *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678 (quoting *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323).

84. *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)).

85. *St. Amant*, 390 U.S. at 733, 88 S.Ct. 1323 (citing *New York Times*, 376 U.S. at 287–288, 84 S.Ct. 710).

86. *Harte–Hanks*, 491 U.S. at 667–668, 109 S.Ct. 2678.

87. *Id.* at 668, 109 S.Ct. 2678 (citations omitted).

88. *Id.* at 688, 109 S.Ct. 2678.

89. *St. Amant*, 390 U.S. at 730, 88 S.Ct. 1323.

or reckless disregard' required under the *New York Times* test ... is not always easy of ascertainment."[90] "Inevitably its outer limits will be marked out through case-by-case adjudication, as is true with so many legal standards for judging concrete cases".[91] This does not mean that courts must

> "scrutinize carefully every jury verdict in every libel case, in order to ascertain whether the final judgment leaves fully protected whatever First Amendment values transcend the legitimate state interest in protecting the particular plaintiff who prevailed." [T]his approach would lead to unpredictable results and uncertain expectations....[92]

The import of the Supreme Court's admonitions is that the boundaries of actual malice, and particularly reckless disregard, cannot be fixed by the defining words alone but must be determined by the applications of those words to particular circumstances. Actual malice is defined in important part by example. Necessarily, then, to more fully understand "reckless disregard", we must survey the Supreme Court's application of the standard in concrete cases.

The Supreme Court's most recent application of the "reckless disregard" standard was in *Harte–Hanks Communications, Inc. v. Connaughton*.[93] Connaughton, a candidate for judicial office, had persuaded a certain Stephens a few weeks before the election to give him a recorded statement regarding instances in which she had bribed an employee in the incumbent judge's office. Stephens's sister, Thompson, was present along with a number of other people when Stephens gave Connaughton her statement. A few days before the election Thompson told the local newspaper that Connaughton had used "dirty tricks" to get Stephens's statement, intending to present it to the incumbent judge privately and force the judge's resignation before the election. The newspaper published Thompson's account of the events as true. Connaughton sued, and a jury found that the newspaper had acted with actual malice. The jury awarded Connaughton $5,000 in compensatory damages and $195,000 in punitive damages, the trial court rendered judgment on the verdict, and the court of appeals affirmed. The Supreme Court held that while "[t]here is little doubt that 'public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the [actual malice standard],' "[94] the newspaper acted with actual malice because: it ignored the fact that all of the persons present when Stephens gave her statement denied that Connaughton had acted improperly; it declined to listen to the Stephens tape itself and did not interview Stephens; Thompson's story was highly improbable given that Connaughton had not misused the tape but had simply turned it over to law enforcement authorities; and Thompson's hesitating demeanor at the newspaper offices reflected in her taped interview suggested a lack of veraci-

**90.** *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 276, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971).

**91.** *St. Amant*, 390 U.S. at 730–731, 88 S.Ct. 1323.

**92.** *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (quoting *Rosenbloom v. Metromedia, Inc.*, 403

U.S. 29, 63, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (Harlan, J., dissenting)).

**93.** 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

**94.** *Id.* at 686, 109 S.Ct. 2678 (quoting *Ocala Star–Banner Co. v. Damron*, 401 U.S. 295, 300, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971)).

ty as compared with Connaughton.[95]

The Supreme Court in *Harte–Hanks* noted how similar the facts in that case were to those in *Curtis Publishing Co. v. Butts*.[96] In *Curtis Publishing*, the *Saturday Evening Post* published an article accusing Wally Butts, the athletic director of the University of Georgia, of having fixed a football game with Paul "Bear" Bryant, football coach at the University of Alabama. The story was based on an affidavit by an insurance salesman who claimed to have overheard a telephone conversation a week before the game in which Butts described for Bryant his plays and game plan. Butts had retired before the story ran. The article concluded:

> The chances are that Wally Butts will never help any football team again.... The investigation by university and Southeastern Conference officials is continuing; motion pictures of other games are being scrutinized; where it will end no one so far can say. But careers will be ruined, that is sure.[97]

Butts sued. To prove that the magazine had acted with actual malice, Butts offered evidence at trial that although the editors recognized the seriousness of the charges being made and the importance of a full investigation, they ignored elementary precautions; that they ignored the fact that their informant was on probation for bad check charges and sought no independent corroboration, even though another person also claimed to have overheard the conversation; that the reporter did not

view films of the game or consult with football experts to determine whether the game appeared to have been fixed the way it was played; and that "the Saturday Evening Post was anxious to change its image by instituting a policy of 'sophisticated muckraking,' and the pressure to produce a successful expose might have induced a stretching of standards."[98] The jury awarded Butts $60,000 in actual damages and $3 million in punitive damages, but the trial court reduced the total to $460,000 by remittitur. The court of appeals affirmed. The Supreme Court also affirmed, concluding that the evidence clearly showed that the magazine had acted with actual malice in publishing the article after a "grossly inadequate" investigation,[99] despite Butts's denial of the allegations, and "with full knowledge of the harm that would likely result from publication of the article."[100]

By contrast, the Supreme Court just as readily concluded that actual malice had not been proved in a companion case to *Curtis Publishing, Associated Press v. Walker*.[101] There, a reporter had provided an eyewitness account of the violence that occurred when federal marshalls attempted to enforce a federal court decree that James Meredith be permitted to enroll at the University of Mississippi. The reporter stated that Walker, a private citizen and retired army veteran, had led a riot against the marshalls. Walker claimed that this was false and that in fact, while

---

**95.** *Harte–Hanks*, 491 U.S. at 691, 109 S.Ct. 2678.

**96.** 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

**97.** *Id.* at 137, 87 S.Ct. 1975 (plurality opinion).

**98.** *Id.* at 158, 87 S.Ct. 1975 (plurality opinion).

**99.** *Id.* at 156, 87 S.Ct. 1975 (plurality opinion).

**100.** *Id.* at 170, 87 S.Ct. 1975 (Warren, C.J., concurring).

**101.** 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

he was present at the time, he had counseled restraint. A jury found that Walker had been defamed, had suffered $500,000 in actual damages, and should have been awarded $300,000 in punitive damages. The trial court rendered judgment for the actual damages but not the punitive damages, concluding that there was no evidence of malice to support such an award. The Supreme Court determined that Walker was a public figure subject to the actual malice standard because he had purposefully thrust himself "into the 'vortex' of an important public controversy;" [102] that discrepancies in the published account were insignificant; that the reporter was experienced and reliable; and that the evidence supported the trial court's determination that there was no evidence of ill will, a complete lack of care, or conscious indifference of Walker's rights.

In *Time, Inc. v. Pape,*[103] *Time Magazine* reported on a federal commission's study of police brutality. The study stated in essence that *allegations* in specific cases demonstrated a problem that demanded discussion, thus encouraging the reader to believe that the allegations were probably true while stressing that they were only allegations—a statement the Supreme Court said could "fairly be characterized as extravagantly ambiguous." [104] In its story, *Time* set out some of the circumstances described in the study but did not state that they were merely allegations. One officer mentioned in the story sued. The trial court directed a verdict for the defendant, but the court of appeals re-

versed. The Supreme Court upheld the trial court, concluding:

> *Time*'s omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under *New York Times.*[105]

In a very different context, the Supreme Court reiterated its view that actual malice cannot be based on a misinterpretation of ambiguous facts that is not unreasonably erroneous. In *Bose Corp. v. Consumers Union of United States, Inc.,*[106] a writer for *Consumer Reports* described a Bose sound system as making instruments sound as if they were "wander[ing] about the room." [107] Bose sued for product disparagement. At trial, the writer testified that the system actually made instruments sound as if they were moving along the wall, which he said meant the same thing as what he had published. The trial court found that the two descriptions were plainly at odds, that the published comment was false, that the defendant's efforts at trial to explain away the error showed actual malice, and that Bose should recover about $125,000 in actual damages. The Supreme Court agreed with the court of appeals' reversal of the judgment, concluding that the writer's adoption of a new description of the system at trial proved only that he had "a capacity for rationalization",[108] not that he knew he was wrong at the time he first reviewed the sound

---

102. *Id.* at 155, 87 S.Ct. 1975 (plurality opinion).

103. 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971).

104. *Id.* at 287, 91 S.Ct. 633.

105. *Id.* at 290, 91 S.Ct. 633.

106. 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

107. *Id.* at 488, 104 S.Ct. 1949.

108. *Id.* at 512, 104 S.Ct. 1949.

system. The earlier description merely "reflect[ed] a misconception,"[109] the Supreme Court said, which was not the equivalent of actual malice.

As already noted, the mere failure to investigate the facts, by itself, is no evidence of actual malice. Thus, in *Beckley Newspapers Corp. v. Hanks*,[110] the Supreme Court held that a newspaper's failure to conduct an investigation before criticizing a county clerk for opposing fluoridation of the local water supply was no evidence of actual malice. The Supreme Court cited its decision in the *New York Times* case, which concluded that the newspaper's failure to check its own files to determine the accuracy of an advertisement critical of the local government's handling of racial unrest before having it published was no evidence of actual malice, especially since the newspaper had relied on a number of credible people in making the statements it did.[111] But there was other evidence of actual malice in *New York Times:* the statements made, though reasonable, were not entirely true, and when the newspaper was confronted with the errors, it at first refused to retract the statements. The Supreme Court did not dismiss the libel claims in that case but remanded them for a new trial.[112]

Finally, in *St. Amant v. Thompson*,[113] Thompson, a deputy sheriff, sued St. Amant, a candidate for public office, for quoting Albin, a member of a local union involved in an internal union dispute, as saying that Thompson had misused his office to help the union president. A jury awarded Thompson $5,000. The Supreme Court held that Thompson had not proved actual malice with evidence that St. Amant had no personal knowledge of Albin's statements, that he had made no attempt to verify those statements, and that he had acted without regard for the injury Thompson might suffer. On the contrary, the Court reasoned, the evidence showed that St. Amant reasonably believed Albin, whom he had known for several months, because "Albin seemed to St. Amant to be placing himself in personal danger by publicly airing the details of the dispute."[114] Reflecting on the consequences of the actual malice standard, the Supreme Court explained:

It may be said that such a test puts a premium on ignorance, encourages the irresponsible publisher not to inquire, and permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity. Concededly the reckless disregard standard may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man or the prudent publisher. But *New York Times* and succeeding cases have emphasized that the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies. Neither lies nor false communications serve the ends of the First

109. *Id.* at 513, 104 S.Ct. 1949.

110. 389 U.S. 81, 84–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967) (per curiam).

111. *New York Times Co. v. Sullivan*, 376 U.S. 254, 287–288, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

112. *Id.* at 284, 84 S.Ct. 710.

113. 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

114. *Id.* at 733, 88 S.Ct. 1323.

Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones.[115]

While insisting that evidence of actual malice be convincing, the Supreme Court stressed that proof of actual malice could not be defeated with simply the defendant's self-serving protestations of sincerity:

> The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.[116]

■■■■ To summarize, the actual malice standard requires that a defendant have, subjectively, significant doubt about the truth of his statements at the time they are made. To disprove actual malice, a defendant may certainly testify about his own thinking and the reasons for his actions, and may be able to negate actual malice conclusively.[117] But his testimony that he believed what he said is not conclusive, irrespective of all other evidence. The evidence must be viewed in its entirety. The defendant's state of mind can—indeed, must usually—be proved by circumstantial evidence. A lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered. An understandable misinterpretation of ambiguous facts does not show actual malice, but inherently improbable assertions and statements made on information that is obviously dubious may show actual malice. A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is. Imagining that something may be true is not the same as belief.

**B**

■■■■ The First Amendment not only protects a public official's critics from liability for defamation absent proof that they acted with actual malice, it also requires that such proof be made by clear and convincing evidence[118] and that the fact finder's determinations at trial be reviewed independently on appeal.[119] The Supreme Court has not defined "clear and convincing evidence" for purposes of determining actual malice but has noted that in

115. *Id.* at 731–732, 88 S.Ct. 1323.

116. *Id.* at 732, 88 S.Ct. 1323.

117. *See WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 574 (Tex.1998).

118. *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 55, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (proof must be with "convincing clarity", cit-

ing *New York Times v. Sullivan,* 376 U.S. at 285, 84 S.Ct. 710); *Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 119 (Tex.2000).

119. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685–686, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Bose Corp. v. Consumers Union,* 466 U.S. 485, 510–511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).

other contexts the phrase has been used to mean "evidence which 'produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'"[120] Similarly, we have held, generally as well as for the purpose of proving actual malice, that evidence is clear and convincing if it supports a firm conviction that the fact to be proved is true.[121] We apply that standard in this case. The Supreme Court has explained the requirement of independent appellate review of the evidence regarding actual malice as follows:

The requirement of independent appellate review reiterated in *New York Times Co. v. Sullivan* is a rule of federal constitutional law. It emerged from the exigency of deciding concrete cases; it is law in its purest form under our common-law heritage. It reflects a deeply held conviction that judges—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."[122]

The independent review required by the First Amendment is unlike the evidentiary review to which appellate courts are accustomed in that the deference to be given the fact finder's determinations is limited. Indeed, the Supreme Court has stated that "[t]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law."[123] On questions of law we ordinarily do not defer to a lower court at all.[124] But the sufficiency of disputed evidence to support a finding cannot be treated as a pure question of law when there are issues of credibility. No constitutional imperative can enable appellate courts to do the impossible—make crucial credibility determinations without the benefit of seeing witnesses' demeanor. If the First Amendment precluded consideration of credibility, the defendant would almost always be a sure winner as long as he could bring himself to testify in his own favor. His assertions as to his own state of mind, if they could not be disbelieved on appeal, would surely prevent proof of actual malice by clear and convincing evidence absent a "smoking gun"—something like a defendant's confession on the verge of making a statement that he did not believe it to be true. The First Amendment does not afford even a media defendant such protection. In the Supreme Court's words, "[w]e have not gone so far ... as to accord the press absolute immunity in its coverage of public figures or elec-

**120.** *Cruzan v. Director, Missouri Dept. of Health,* 497 U.S. 261, 285 n. 11, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (citing *In re Jobes,* 108 N.J. 394, 529 A.2d 434, 441 (1987), regarding the proof necessary to justify the withdrawal of life support).

**121.** *Huckabee v. Time Warner Entertainment Co.,* 19 S.W.3d 413, 422(Tex.2000).

**122.** *Bose,* 466 U.S. at 510–511, 104 S.Ct. 1949.

**123.** *Harte–Hanks,* 491 U.S. at 685, 109 S.Ct. 2678 (citing *Bose,* 466 U.S. at 510–511, 104 S.Ct. 1949).

**124.** *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

tions." [125] The independent review on appeal required by the First Amendment does not forbid any deference to a fact finder's determinations; it limits that deference. How far is the difficulty.

For practical direction, we have the Supreme Court's review of the evidence in *Harte–Hanks*. There, as we have already explained, a newspaper reported that Connaughton, a judicial candidate, had used "dirty tricks" to obtain a recorded statement from one Stephens concerning her efforts to bribe an employee in the office of Connaughton's opponent, the incumbent judge, and that he intended to present the statement to the judge privately to force him to resign. The newspaper report was based almost entirely on information provided by Stephens's sister, Thompson. A jury found that the newspaper had acted with actual malice. The Supreme Court described the independent review process as follows:

> In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed [in the federal courts] under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," the reviewing court must " 'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.' " [126]

Following this procedure, the Court first determined that the jury must have disbelieved the following testimony by newspa-per employees in order to find that the newspaper had acted with actual malice:

- that the reason the newspaper did not interview Stephens herself was that Connaughton did not put her in contact with the newspaper;

- that the reason the newspaper did not listen to the tapes of Stephens's statements was that it did not believe the tapes would provide any additional information; and

- that they had believed that Thompson's allegations were substantially true.[127]

The jury could not have found this evidence credible and still have found that the newspaper had acted with actual malice. That is, had the jury believed that the newspaper thought that Thompson's allegations were true or that no further investigation of the facts would be productive, it could not have found actual malice. These credibility determinations were not clearly erroneous. The Supreme Court then determined that the following evidence was undisputed:

- Connaughton and others had denied Thompson's allegations;

- the newspaper knew before it published the story that "Thompson's most serious charge—that Connaughton intended to confront the incumbent judge with the tapes to scare him into resigning and otherwise not to disclose the existence of the tapes—was not only highly improbable, but inconsistent with the fact that Connaughton had actually arranged a lie detector test for Stephens and then delivered the tapes to the police"; [128] and

---

**125.** *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678.

**126.** *Id.* (citation omitted).

**127.** *Id.* at 690, 109 S.Ct. 2678.

**128.** *Id.* at 691, 109 S.Ct. 2678.

- Thompson's "hesitant, inaudible, and sometimes unresponsive and improbable tone" in her interview with the newspaper (which was taped) raised "obvious doubts about her veracity." [129]

Finally, disregarding what the jury reasonably found to be incredible and considering only what was undisputed or what the jury could have believed, the Supreme Court concluded:

Accepting the jury's determination that petitioner's explanations for [its failure to interview Stephens or listen to her recorded statement] were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category. [130]

In sum, the Supreme Court explained, "[w]hen [the findings the jury must have made to reach the verdict it did] are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inexorably follows." [131]

█ We are constrained, of course, to follow this same approach. Hence, an independent review of evidence of actual malice should begin with a determination of what evidence the jury must have found incredible. In *Harte–Hanks*, that evidence comprised the defendant's self-serving assertions regarding its motives and its belief in the truth of its statements. As long as the jury's credibility determina-

tions are reasonable, that evidence is to be ignored. Next, undisputed facts should be identified. In *Harte–Hanks*, those facts included the denial of Thompson's allegations by Connaughton and others, and the improbability of those allegations given other facts and what the Supreme Court itself could tell from Thompson's taped interview was an obvious lack of credibility. [132] Finally, a determination must be made whether the undisputed evidence along with any other evidence that the jury could have believed provides clear and convincing proof of actual malice.

█ This process goes a long way toward avoiding the possibility foreseen and discounted by the Supreme Court in *St. Amant* that, because the actual malice standard focuses on a defendant's subjective state of mind, a defendant could insulate himself from liability by his own self-serving testimony. "The defendant in a defamation action brought by a public official cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith." [133] The fact finder may choose with reason to disregard the defendant's testimony, and if it does, so must the appellate court in its independent review. That does not mean, of course, that the plaintiff can prevail merely because the jury chooses not to believe the defendant. The jury's decisions regarding credibility must be reasonable. Moreover, it remains the plaintiff's burden to adduce clear and convincing evidence of actual malice. The evidence may well not rise to

---

129. *Id.*

130. *Id.* at 692, 109 S.Ct. 2678 (citation omitted).

131. *Id.* at 690–691, 109 S.Ct. 2678.

132. *Id.*

133. *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

that level even apart from the defendant's own testimony.

With this understanding of actual malice, clear and convincing evidence, and the review we are required to undertake, we turn to the evidence of this case.

## C

After five days of trial, at which Bentley, Bunton, and Gates all appeared and testified extensively in person, the jury found clear and convincing evidence that Bunton had published defamatory statements about Bentley with "actual malice". The jury also found from a preponderance of the evidence that Bunton had acted with "malice". The trial court correctly defined "actual malice" and "clear and convincing evidence" for the jury as follows:

A defamatory statement is made with "actual malice" if it is made with actual knowledge that it is false or with reckless disregard as to its truth or falsity. "Reckless disregard as to its truth or falsity" means a high degree of awareness of probable falsity, to an extent that the person publishing the statement entertained serious doubts as to the truth of the publication.

"Clear and convincing evidence" is that measure or degree of proof that will produce in the mind of the jury a firm belief or conviction as to the truth of the allegations sought to be established.

The trial court defined "malice" as follows:

"Malice" means a specific intent by the defendant to cause substantial injury to the claimant, or an act or omission which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and of which the actor has actual,

subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.[134]

■ We begin our review of the evidence by determining what testimony the jury necessarily rejected in finding that Bunton acted with "actual malice" and "malice". Bunton testified at trial that whenever he had made statements about Bentley he believed them to be true at the time and that he still believed they were true. In this regard at least, the jury must have found Bunton not to be a credible witness. His testimony concerning his subjective beliefs is inconsistent with the jury's verdict. Furthermore, the jury must have disbelieved Bunton's testimony that his intent was not to embarrass or defame Bentley but only to promote good government, provide information, and correct any perception of injustice. Bunton's testimony about his intentions is likewise inconsistent with the jury's verdict. We see nothing unreasonable in the jury's decision not to believe Bunton. Thus, just as the Supreme Court in *Harte–Hanks* disregarded the defendant's testimony regarding its motives and beliefs, we must disregard Bunton's testimony of the same sort here.

■ Next, we determine what facts were established conclusively. First, Bunton knew by his own admission, at least after the June 6, 1995 "Q&A" broadcast, that Bentley denied the allegations that had been made. Bentley telephoned Bunton to discuss the allegations, but Bunton did not return the call. Instead, Bunton dared Bentley to appear on a "Q&A" show. Bentley testified that he feared he could not appear with Bunton on the show without being further unfairly abused. Also,

---

**134.** *See* TEX. CIV. PRAC. & REM. CODE § 41.001(7).

the videotapes of "Q&A" broadcasts in evidence establish that Bunton knew that others besides Bentley believed the allegations to be false. Second, it is undisputed that Gates told Bunton that he, Gates, did not believe Bentley was corrupt. Third, Bunton does not dispute his friend's account of their conversation, in which Bunton stated that "he really couldn't get anything on ... old Bascom Bentley", and that Bentley was "doing something", "I just don't know what it is." This occurred after Bunton had "investigated" the Curbo case and during the same time that he was accusing Bentley of being corrupt. Thus, while Bunton was telling the "Q&A" viewing audience that Bentley was corrupt in his handling of the Curbo case, he was confiding in a friend that "he really couldn't get anything on ... old Bascom Bentley" except that he ate lunch with "that clique". Bunton also acknowledged in one broadcast that it had been "difficult to pin down" any misconduct by Bentley. Fourth, the occurrences on which Bunton based his allegations of corruption did not prove those charges, as a matter of law. Remarkably, long after Curbo's father was defeated in his bid for mayor, Bunton continued to accuse Bentley of delaying the Curbo case to pressure Curbo's father as mayor. Fifth, in broadcasts stretching over many months, Bunton repeatedly accused Bentley not only of being corrupt—by which he meant dishonest, unethical, shady, and unscrupulous—but also of not doing his job or earning his salary, going to lunch with a "clique", and being "grossly incompetent or ... awful lazy" and a "disgrace" to his children.

Finally, we consider this undisputed evidence in light of the entire record. Apart from Bunton's own self-serving assertions that are inconsistent with the jury's verdict and must therefore be ignored, the only evidence that he did not act with actual malice is that he attempted to make some investigation before airing his allegations. Specifically, Bunton stated that he obtained court records and did legal research to support his allegations. The jury could have believed this testimony and still found that he acted with actual malice, and therefore we must credit this evidence in our own assessment of the record. But we do not consider it to have much weight when there is no evidence that Bunton's investigation ever led him to contact any one of a number of other people involved in the circumstances he criticized. He did not ask the district attorney, defense counsel, or the probation officer about the delay in the Curbo case. Curbo's lawyer testified at trial that the delay benefitted his client, and the probation officer wrote the court that the case was being handled appropriately. Bunton did not ask the sheriff, the county auditor, or any member of the county commissioners court about the handling of the "hot check" and confiscated property funds, he did not call the Texas Ethics Commission about the propriety of Bentley's contributions to two county judge candidates, he did not ask a lawyer about any of the rulings for which he faulted Bentley in various cases, and he ignored the investigation into his own charges of misconduct against the district attorney. We are mindful that a failure to investigate the facts is not, by itself, any evidence of actual malice, but what is so striking about the record in this case is the complete absence of any evidence that a single soul, besides Gates, ever concurred in Bunton's accusations of misconduct against Bentley. All those who could have shown Bunton that his charges were wrong Bunton deliberately ignored. Even after Bunton encouraged "Q&A" viewers to report any misconduct by Bentley, and went so far as to instruct on how that could be done anony-

mously, the record is silent as to whether anyone ever responded.

From our thorough review of the record and our detailed recitation of the evidence, whether Bunton's actual malice has been proved by clear and convincing evidence is not, we think, a close question. We are convinced, by no small margin, that Bunton never made his allegations against Bentley in good faith, that he expressed doubt to a friend that there was any basis for the charges he was making, and that he deliberately ignored people who could have answered all of his questions. The fact that Bunton dared his victims to appear on his show but made no attempt to hear them privately strongly supports our conclusion.

 Moreover, while a defendant's ill will toward a plaintiff does not equate to, and must not be confused with, actual malice, such animus may suggest actual malice.[135] Bunton hounded Bentley relentlessly and ruthlessly for months, despite the threat of suit and at least one entreaty from Gates, asserting that Bentley was not earning his salary, that he was part of a clique of local leaders who lunched together, that he should resign, that he had been "very, very slick" to avoid being caught, and that he was "either . . . just grossly incompetent, or . . . awful lazy". Bunton told Bentley's sister that Bentley was corrupt and stated that Bentley had disgraced his own children. Bunton even coached callers on how to register complaints about Bentley anonymously. This evidence that Bunton carried on a personal vendetta against Bentley without regard for the truth of his allegations also indicates actual malice.

Accordingly, we conclude that the evidence that Bunton acted with actual malice in defaming Bentley was clear and convincing. CHIEF JUSTICE PHILLIPS's contrary conclusion is, in our view, the product of faulty analysis that granulates the evidence tending to show actual malice but amalgamates all of the contrary evidence. Because no single piece of evidence proves actual malice, and there is some evidence to the contrary, he concludes that Bentley has not met his burden. We think, however, that when the evidence is viewed as a whole, as it must be, it convincingly shows Bunton's actual malice. It is simply unfair for CHIEF JUSTICE PHILLIPS to dismiss what he describes as Bunton's "protracted verbal barrage"[136] of "defamatory falsehoods"[137] against Bentley as "ill manners, legal mistakes, and ineffective investigation."[138] Nor were Bunton's erroneous charges merely due to a lack of legal training, as CHIEF JUSTICE PHILLIPS suggests; on the contrary, there was unchallenged testimony at trial that no reasonable person could have believed Bunton's accusations.

## D

 Unlike Bunton, Gates testified that he never believed Bentley was corrupt. Gates never used the word "corrupt" in discussing Bentley's conduct, but there is evidence to support the jury's finding that he agreed with Bunton's allegations on two "Q&A" broadcasts. If he knew he was communicating a falsehood, then there can be no question that he acted with actual malice because he him-

---

**135.** *Duffy v. Leading Edge Prods., Inc.,* 44 F.3d 308, 315 n. 10 (5th Cir.1995); *see* SACK, *supra* note 44, § 5.5.2, at 5–77 to 5–78; SMOLLA, *supra* note 48, §§ 3.15–3.16, at 3–42.1 to 3–42.2.

**136.** *Post* at 608.

**137.** *Id.*

**138.** *Id.*

self acknowledges that he did not believe the allegations of corruption. But a defendant cannot be said to have made a statement with actual malice if he did not know or have reckless disregard for whether the statement communicated a falsehood. In *Turner v. KTRK Television, Inc.*, we held that while a message may be false and defamatory as a whole, even though no single statement is false, proof of actual malice requires clear and convincing evidence that the defendant "knew or strongly suspected that the publication as a whole could present a false and defamatory impression...." [139] Here, too, we think that the actual malice standard focuses on the defendant's state of mind regarding the import of the statements actually made. If in response to the statement that P is a felon, D says, "Yes, indeed," knowing full well that P is not a felon, the evidence is clear and convincing that D has acted with actual malice. Even though his own words are neutral in isolation, in context he can hardly deny that he knew he was communicating agreement with what he knew was false. But had D replied only, "Do tell," the evidence of actual malice is nil. D could quite credibly argue that his response was but a polite acknowledgment of the statement and that he had no reasonable idea he would be taken to have endorsed it. Thus, with respect to Gates, we think that the actual malice standard requires clear and convincing evidence that on one of the two occasions in question, either he knew that what he said communicated that Bentley was corrupt, or else he had reckless disregard for whether he had communicated that message.

We have already described the two occasions, both of which occurred on "Q&A" broadcasts, a videotape of which was before the jury. In one, Bunton had told a caller that the district attorney, not Bentley, was the most corrupt official in Anderson County. As Gates started to correct Bunton, Bunton interrupted and corrected himself, saying "Bascom Bentley's number one." "Yeah," Gates replied. At trial, Gates testified that he thought "yeah" "was a spontaneous reaction more than anything". On the other occasion, Bunton listed two situations showing that Bentley was corrupt. Gates then named two other situations and added, "and there's some others besides." Gates did not offer an explanation of this occasion at trial, but he now says, in argument on appeal, that he was merely helping Bunton list the situations Bunton had himself mentioned in the past. Gates did testify that he bore Bentley no ill will, and that he had told Bunton that he did not believe Bentley was corrupt.

The jury found that Gates's remarks communicated his agreement with Bunton's allegations that Bentley was corrupt, and that in so doing Gates acted with "actual malice" and "malice", as those words were defined by the trial court in the charge (which we have quoted above). In reviewing the evidence following the procedure set out in *Harte–Hanks*, we must first disregard Gates's testimony that "yeah" was only a spontaneous reaction, that he ever told Bunton that Bentley was not corrupt, and that he bore Bentley no ill will; all of this testimony is inconsistent with the verdict and could not have been believed by the jury. The jury reasonably refused to believe Gates. Thus, we must consider the effect of Gates's statements on their face, without benefit of Gates's explanations, in light of the undisputed evidence and the remainder of the record.

Two facts are undisputed. One is that Gates never believed Bentley was corrupt.

**139.** 38 S.W.3d 103, 120 (Tex.2000) (citation omitted).

Gates admits this himself. The other is that Gates participated with Bunton on numerous "Q&A" programs over a period of many months, listening to Bunton repeatedly accuse Bentley of being corrupt, and never took issue with one of Bunton's accusations. Indeed, on one occasion Gates helped Bunton list examples of Bentley's corrupt conduct. In addition, except for Gates's testimony, which we must disregard, the record is silent on whether Gates ever disagreed with Bunton that Bentley was corrupt. Gates's counsel asked Bunton whether Gates "disagree[d] with you on occasion when discussing Judge Bentley on the air." Bunton answered: "Colonel Gates and I have had a lot of disagreements, not about the facts, but a disagreement in direction, in technique." Although Gates did not dispute that he told Bentley he would ask Bunton to stop calling Bentley corrupt, Gates did not adduce any evidence to show that he did so.

Were the two "Q&A" shows in which Gates chimed in during Bunton's allegations isolated instances, we certainly could not find clear and convincing evidence in this record that Gates either knew or had reckless disregard for whether he was communicating that Bentley was corrupt, something he knew was false. But the two shows cannot be viewed in isolation. Gates knew what Bunton's allegations were. He had sat next to Bunton as Bunton repeated them on many occasions. Still, Gates remained silent all but twice, and both times his reaction was ambiguous. From the videotapes of those two occasions, we cannot say, even in the context of Bunton's ongoing verbal assaults against Bentley in Gates's presence, that Gates knew or had reckless disregard for

whether he was himself communicating a falsehood.

The jury's finding of Gates's ill will and spite toward Bentley cannot prove actual malice by itself and does not alter our conclusion. Although the issue is a close one, we hold that the evidence of Gates's actual malice was not clear and convincing.

## VI

Regarding damages, Bunton argues that the evidence does not support any award of actual or punitive damages to Bentley, and alternatively, that the amounts of actual and punitive damages determined by the jury are without support in the evidence and exceed First Amendment limitations.

 The first argument need not long detain us. Our law presumes that statements that are defamatory per se injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish.[140] Bunton does not contest that if, as we have now held, Bunton's statements were false statements of fact and not merely expressions of opinion, then they were defamatory per se, as the trial court ruled. As a matter of law then, Bentley was entitled to recover actual damages for injury to his reputation and for mental anguish. Moreover, from the evidence we have summarized above, the jury could readily have found that Bentley's reputation was in fact injured and that he in fact suffered mental anguish on account of the defendants' conduct. Also, because the defendants acted with actual malice, Bentley is entitled to punitive damages without proving that the defendants

**140.** *See Leyendecker & Assoc., Inc. v. Wechter,* 683 S.W.2d 369, 374 (Tex.1984); *City of Tyler* *v. Likes,* 962 S.W.2d 489, 495 (Tex.1997).

were personally vindictive toward him,[141] although again, the evidence supports the jury's finding that in fact Gates and Bunton acted "with specific intent . . . to cause substantial injury", as found by the jury.

Bunton's second argument—that the amounts of damages awarded are not supported by the evidence or permitted by the First Amendment—requires more analysis.

### A

■ The jury found that Bunton caused Bentley $7 million in mental anguish damages and $150,000 in damages to his character and reputation. Non-economic damages like these cannot be determined by mathematical precision; by their nature, they can be determined only by the exercise of sound judgment. But the necessity that a jury have some latitude in awarding such damages does not, of course, give it carte blanche to do whatever it will, and this is especially true in defamation actions brought by public officials.

In *Gertz v. Robert Welch, Inc.*, the United States Supreme Court held that state law may set a lesser standard of culpability than actual malice for holding a media defendant liable for defamation of a private plaintiff, but under any lesser standard the plaintiff can recover "only such damages as are sufficient to compensate him for actual injury."[142] Noting that damages may be presumed without proof of injury in certain defamation cases, such as those involving defamation per se, the Court expressed concern that "[t]he largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds the potential of

any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms."[143] The Court expressed the same concern regarding punitive damages.[144]

Although the Court did not consider whether limitations should be placed on damage awards when a defendant is shown to have acted with actual malice, we think that similar concerns are raised. Damage awards left largely to a jury's discretion threaten too great an inhibition of speech protected by the First Amendment. This case is a prime example. The jury's award of $7 million in mental anguish damages strongly suggests its disapprobation of Bunton's conduct more than a fair assessment of Bentley's injury. The possibility that a jury may exercise such broad discretion in determining the amount to be awarded unrestrained by meaningful appellate review poses a real threat to all members of the media.

Accordingly, we conclude that the First Amendment requires appellate review of amounts awarded for non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant. Exercising that review in this case, we conclude that while the record supports Bentley's recovery of some amount of mental anguish damages, it does not support the amount of those damages found by the jury.

### B

■ Moreover, under our common law the latitude necessarily accorded a jury in assessing non-economic damages does not

---

**141.** *Leyendecker*, 683 S.W.2d at 374–375.

**142.** 418 U.S. 323, 349–350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**143.** *Id.* at 349, 94 S.Ct. 2997.

**144.** *Id.* at 350, 94 S.Ct. 2997.

insulate its verdict from appellate review for evidentiary support. Just as a jury's prerogative of assessing the credibility of evidence does not authorize it to find liability when there is no supporting evidence or no liability in the face of unimpeachable evidence, so a large amount of mental anguish damages cannot survive appellate review if there is no evidence to support it, or a small amount of damages when the evidence of larger damages is conclusive. The jury is bound by the evidence in awarding damages, just as it is bound by the law.

Our law distinguishes between appellate review for no evidence and insufficient evidence. The courts of appeals are authorized to determine whether damage awards are supported by insufficient evidence—that is, whether they are excessive or unreasonable. We have rejected the view that that authority displaces their obligation, and ours, to determine whether there is any evidence at all of the *amount* of damages determined by the jury. In *Saenz v. Fidelity & Guaranty Insurance Underwriters*, we explained:

> Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. We disagree with the court of appeals that "[t]ranslating mental anguish into dollars is necessarily an arbitrary process for which the jury is given no guidelines." [*Fidelity & Guaranty Insurance Underwriters v. Saenz*, 865 S.W.2d 103, 114 (Tex.App.-Corpus Christi 1993)]. While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. They must find an amount that, in the stan-

dard language of the jury charge, "would fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes "substantial disruption in ... daily routine" or "a high degree of mental pain and distress". *Parkway* [*v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995)]. There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations. One court of appeals has suggested the contrary. *See State Farm Mut. Auto. Ins. Co. v. Zubiate*, 808 S.W.2d 590, 601 (Tex.App.-El Paso 1991, writ denied); *Daylin, Inc. v. Juarez*, 766 S.W.2d 347, 352 (Tex.App.-El Paso 1989, writ denied); *Brown v. Robinson*, 747 S.W.2d 24, 26 (Tex.App.-El Paso 1988, no writ). We disapprove that language in those cases.[145]

We concluded in *Saenz* that there was no evidence to support the $250,000 damages for mental anguish awarded by the jury.

This case is far clearer than *Saenz*. The record leaves no doubt that Bentley suffered mental anguish as a result of Bunton's and Gates's statements. Bentley testified that the ordeal had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, disrupted his family, and distressed his children at school. The experience, he said, was the worst of his life. Friends testified that he had been depressed, that his honor and integrity had been impugned, that his fam-

---

**145.** 925 S.W.2d 607, 614 (Tex.1996).

ily had suffered, too, adding to his own distress, and that he would never be the same. Much of Bentley's anxiety was caused by Bunton's relentlessness in accusing him of corruption. But all of this is no evidence that Bentley suffered mental anguish damages in the amount of $7 million, more than forty times the amount awarded him for damage to his reputation. The amount is not merely excessive and unreasonable; it is far beyond any figure the evidence can support.

The other amounts of actual damages found by the jury are well within a range that the evidence supports. We do not consider whether the awards were unreasonable; that issue was for the lower courts. We conclude only that no evidence permitted the jury to make the findings it did.

## C

Gates and Bunton argue that the amounts of punitive damages determined by the jury were excessive by constitutional standards, but they clearly were not. Punitive damages were a fraction of the actual damages found by the jury. Even if mental anguish damages were reduced, as we conclude they must be, there is evidence to support the punitive damages set by the jury. However, because we conclude that there is no evidence to support part of the actual damage award, punitive damages must be reassessed as well.[146]

## VII

We come finally to what our judgment should be, given the division of the Court. Seven of the eight MEMBERS of the Court participating in the decision of this case agree that the judgment of the court of appeals that Bentley take nothing from Gates should be affirmed. Only JUSTICE BAKER disagrees. Judgment will be rendered accordingly. Regarding Bunton, the Court is more deeply divided. JUSTICE BAKER would render judgment against Bunton and Gates, jointly and severally, for all the damages found by the jury. Three MEMBERS of the Court—CHIEF JUSTICE PHILLIPS, JUSTICE ENOCH, and JUSTICE HANKINSON—would render judgment that Bentley take nothing from Bunton or Gates. The other four MEMBERS of the Court—JUSTICE OWEN, JUSTICE JEFFERSON, JUSTICE RODRIGUEZ, and I—would remand the case to the court of appeals to reconsider the excessiveness of the jury's award of mental anguish damages against Bunton in view of this opinion. It may be that Bentley's action against him must be retried, but the court of appeals is free to suggest a remittitur.

The Court has faced similar divisions before. In *Diamond Shamrock Refining and Marketing Co. v. Mendez*,[147] three JUSTICES would have rendered judgment for the plaintiff, three would have rendered judgment for the defendant, and three would have remanded the case for a new trial. A majority of the Court nevertheless joined in a judgment remanding the case as being the judgment most consistent with their respective views. Also, in *National County Mutual Fire Insurance Co. v. Johnson*,[148] four JUSTICES concluded that an insurance policy provision was valid, four concluded that it was entirely invalid, and one concluded that the provision was only partially invalid. A majority of the Court joined in a judgment invalidating the provision in part. Likewise, today a majority of the Court—all but JUSTICE BAKER—join in the judgment

---

**146.** *Tatum v. Preston Carter Co.,* 702 S.W.2d 186, 187–188 (Tex.1986).

**147.** 844 S.W.2d 198 (Tex.1992).

**148.** 879 S.W.2d 1 (Tex.1993).

remanding this cause to the court of appeals for further proceedings, although the reasons for the remand are advanced by only four justices.

*Judgment accordingly.*

Chief Justice PHILLIPS filed an opinion concurring in part and dissenting in part, and concurring in the judgment, in which Justice ENOCH and Justice HANKINSON joined.

Justice BAKER filed a dissenting opinion.

Justice O'NEILL did not participate in the decision.

Chief Justice PHILLIPS, joined by Justice ENOCH and Justice HANKINSON, concurring in part and dissenting in part.

## I

### A

The United States Supreme Court has long recognized "the privilege for the citizen-critic of government," declaring: "It is as much his duty to criticize as it is the official's duty to administer." *New York Times Co. v. Sullivan,* 376 U.S. 254, 282, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Constitution therefore protects any speech about public officials and public figures unless it is both 1) provably false, *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), and 2) made with either knowledge of its falsity, *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710, or serious doubt as to its truth, *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). Obviously, this high degree of protection "exacts a correspondingly high price from the victims of defamatory falsehood" who may be "unable to surmount the barrier" of that privilege. *Gertz v.*

*Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

"It is of the utmost consequence that the people should discuss the character and qualifications of candidates for their suffrages. The importance to the state and to society of such discussions is so vast, and the advantages derived are so great, that they more than counterbalance the inconvenience of private persons whose conduct may be involved, and occasional injury to the reputations of individuals must yield to the public welfare, although at times such injury may be great."

*New York Times,* 376 U.S. at 281, 84 S.Ct. 710 (quoting with approval *Coleman v. MacLennan,* 78 Kan. 711, 98 P. 281, 286 (1908)).

Undoubtedly, Joe Ed Bunton subjected Judge Bascom Bentley III to a protracted verbal barrage. I agree with the Court that as a matter of law at least some of these statements were defamatory falsehoods. But I also believe that Bentley failed to prove by clear and convincing evidence that Bunton made his statements with actual malice, as that term is used in defamation jurisprudence.

In my own independent appellate review, as required in *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 511, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), I cannot find clear and convincing evidence that Bunton either knew that his statements were false or entertained serious doubts about their truth. The Court's opinion is a judicial miscellany of Bunton's ill manners, legal mistakes, and ineffective investigation, from which a conclusion is concocted that Bunton did not believe his allegations that Bentley was corrupt. Taken separately or together, the incidents the Court recites establish only objective unreasonableness, not the subjective state-of-mind required to prove actual

malice. I would reverse the court of appeals' judgment and render judgment that Bentley take nothing against Bunton.

## B

Unlike Bunton's words, Colonel Jackie Gates' public statements on the Q&A cable-access call-in show were not false and defamatory on their face. However, a reasonable listener could have understood two of Gates' comments to express a defamatory meaning—agreement that Judge Bascom Bentley was corrupt—due to their juxtaposition with Joe Ed Bunton's words.

To prove public-official defamation when the defendant's words could be understood as defamatory or as not, the plaintiff must prove by clear and convincing evidence that the defendant either knew or strongly suspected at the time he spoke that his words would carry a defamatory meaning to the ordinary listener. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 120 (Tex.2000); *see also Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[O]nly those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions."). If this showing is made, the public-official plaintiff must also prove by clear and convincing evidence that the defendant either knew the defamatory meaning was false, *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710, or seriously doubted its truth, *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323. I agree that Bentley has failed to carry his burden as to Gates.

## II

The United States Supreme Court tailored the actual malice test to discourage the self-censorship that libel law might otherwise impose on political speech. In *New York Times*, the Times had published a defamatory advertisement containing significant factual errors. *New York Times*, 376 U.S. at 256–59, 84 S.Ct. 710. The Times possessed the correct information in its own news files but failed to consult them. *Id.* at 287, 84 S.Ct. 710. This evidence, the Court held, "support[ed] at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice." *Id.* at 288, 84 S.Ct. 710. This new "actual malice" standard was entirely distinct from common law malice, focusing on knowledge rather than motive.

The *New York Times* Court believed the Constitution required the actual malice test in order to protect free debate and preserve political liberty. Quoting from *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), the Court observed:

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable "self-censorship." Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred.... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. They tend to make only statements which "steer far wider of the unlawful zone." The rule thus dampens the vigor and limits the variety of public debate.

*New York Times*, 376 U.S. at 279, 84 S.Ct. 710. The Court rejected the notions that either the reputations of public officials or the desirability of accurate information

were sufficiently important to justify traditional defamation standards. Thus, the Court observed:

> Where judicial officers are involved, this Court has held that concern for the dignity and reputation of the courts does not justify the punishment as criminal contempt of the judge or his decision. This is true even though the utterance contains "half-truths" and "misinformation." Such repression can be justified, if at all, only by a clear and present danger of the obstruction of justice ... [J]udges are to be treated as men of fortitude, able to thrive in a hardy climate.

*New York Times,* 376 U.S. at 272–73, 84 S.Ct. 710 (citations omitted).

Truthful speech has value. False speech mistakenly believed to be true, while valueless, should be protected to avoid self-censorship of truthful speech. Known falsehood is neither valuable nor necessary to preserve free debate and thus has no constitutional protection.

### III

### A

To recover for defamation, the public-official plaintiff must prove by clear and convincing evidence that the defendant spoke with actual malice. Actual malice is a legal term of art, wholly distinct from the more venerable common law malice. The actual malice inquiry is subjective, focused on the defendant's actual state of mind regarding truth, not the reasonable-

ness of or the reasons for his speech. Thus, the plaintiff must prove that when the defendant spoke he either knew his statements were false or had reckless disregard for their truth. *New York Times,* 376 U.S. at 280, 84 S.Ct. 710. Reckless disregard is also a subjective standard that is not synonymous with common law recklessness. For reckless disregard to exist, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323. Or put another way, the defendant must have made his false and defamatory allegations with a "high degree of awareness of their probable falsity." *Garrison,* 379 U.S. at 74, 85 S.Ct. 209.

When reviewing public-official defamation cases for clear and convincing evidence of actual malice, we defer to the jury only on credibility issues. After determining what testimony the jury must have disbelieved to reach its verdict, we review those findings for clear error. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). Otherwise, the New York Times standard mandates a searching independent review of all factual evidence. *Id.; Bose Corp.,* 466 U.S. at 511, 104 S.Ct. 1949; *New York Times,* 376 U.S. at 285, 84 S.Ct. 710. This federal constitutional standard takes precedence over the limitations on our factual review established in the Texas Constitution. *Turner,* 38 S.W.3d at 120.[1]

---

1. The jury in our case arguably made inconsistent factual findings. In its first three answers, the jury found that "Gates agreed with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt," that he "publish[ed] his agreement with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt," and that "Gates acted with actual malice in publishing his agreement with Joe Ed Bunton's defamatory statements concerning Bascom Bentley being corrupt" by "clear and convincing evidence." If the first question inquires about Gates' objective conduct on Q&A, it duplicates the second question about publication. If the first question asks about Gates' actual subjective agreement, then his publication could not have involved actual malice, a stan-

## B

In finding clear and convincing evidence of actual malice, this Court offers several facts that "were established conclusively" to support its conviction "by no small margin," that Bunton acted with actual malice. 94 S.W.3d at 602. None of these facts, taken singly or together, come close to proving the Court's case that Bunton doubted the truth of his allegations. That Bunton dared Bentley on television to appear live on Q&A rather than returning a private telephone call may establish a breach of etiquette, but it is not evidence of a public figure defamation.[2] That Bunton knew that others disagreed with his allegations is also no evidence of actual malice.[3] That Bunton confessed uncertainty to a friend that "[Bentley's] doing something; I just don't know what it is," and that he acknowledged on a broadcast that Bentley was "difficult to pin down," suggests that he firmly believed Bentley was, in fact, doing *something* wrong.[4] Far from showing by clear and convincing evidence that he was consciously indifferent to the truth, these remarks indicate that he was trying, in his own limited way, to bring to his viewing audience the truth. The Court also points to other harsh, though nondefamatory, epithets that Bun-

ton hurled at Bentley in the course of his broadcasts. But even Bentley does not claim that accusations that he disgraced his children, was lazy, or lunched with a clique are any proof that Bunton did not really believe that Bentley was corrupt.

Most disturbingly, the Court finds clear and convincing evidence of actual malice because "the occurrences on which Bunton based his allegations of corruption did not prove those charges, as a matter of law." *Id.* at 600. I agree that Bentley conclusively established that at least some of Bunton's charges were false as a matter of law. But I strenuously disagree that the falsity of some or all of Bunton's charges proves that Bunton *knew* they were false at the time he made them. *See Bose Corp.*, 466 U.S. at 491 n. 6, 512–13, 104 S.Ct. 1949 (holding that trial court erred when it reasoned that speaker must have known his statements were false at the time he made them because they were, in fact, clearly false).

Moreover, the Court points to evidence of personal animus to suggest that Bunton acted with actual malice. Even if there were such evidence, it would not satisfy the *New York Times* standard. *See Beckley Newspapers Corp. v. Hanks*, 389 U.S.

dard which requires Gates to have disbelieved or seriously doubted that Bentley was corrupt. Because I believe that there is not clear and convincing evidence of actual malice against either defendant, I need not decide whether a conflict exists, and, if so, what legal implications would follow.

2. On the air, Bunton mentioned receiving a telephone call from "somebody ... claiming to be Judge Bentley," which suggests that he did not realize that Bentley himself had placed the call.

3. Although the Court erroneously claims that there is no evidence anyone other than Gates agreed with Bunton's allegations, 94 S.W.3d at 590, the record does suggest that some of

his viewers agreed with him. While testifying at trial about Q&A's periodic viewer polls asking whether or not Bentley was corrupt, Bentley testified: "I nearly won one time, I think."

4. The Court claims that this conversation proves that Bunton was privately admitting his lack of evidence against Bentley to a friend, "while he was telling the Q&A viewing audience that Bentley was corrupt." 94 S.W.3d at 601. In fact, the witness testified at the 1997 trial that the conversation took place "sometime in the summer of 1995." Without a specific date, I cannot assume that it occurred after Bunton's June 6, 1995 broadcast, during which he first accused Bentley of corruption.

81, 82, 88 S.Ct. 197, 19 L.Ed.2d 248 (noting actual malice cannot be based merely on defendant's "'bad or corrupt motive,'" "'personal spite, ill will or a desire to injure plaintiff'"). But, in fact, there is not a shred of evidence in the record to suggest that Bunton had a pre-existing feud with Bentley, or that his desire to harm Bentley's career came from any source except his mistaken belief that Bentley was corrupt. Thus, the Court uses Bunton's erroneous statements to prove that he acted with ill will, then points to that ill will to establish motive for his false statements. The Court substitutes circular reasoning for constitutional analysis.

### C

Most of all, the Court relies on the purposeful-avoidance doctrine of *Harte–Hanks Communications, Inc.,* 491 U.S. at 692–93, 109 S.Ct. 2678. *Harte–Hanks* was a narrow holding, grounded in facts more egregious than those presented here. Before publishing a story attacking the integrity of a candidate for public office, the defendant newspaper was offered access to a tape of a conversation that would have shown whether the story was true or false. *Id.* at 683, 109 S.Ct. 2678. The paper's reporters deliberately chose not to listen to it. *Id.* The Supreme Court concluded that the newspaper's purposeful avoidance of the truth was sufficient to prove that it in fact had serious doubts about the truth of its story. *Id.* at 683–84, 692, 109 S.Ct. 2678.

There is no evidence here that Bunton knew of and had access to a specific piece of evidence that he knew would prove or disprove his allegations, yet consciously chose not to learn of its contents. The Court points out that Bunton did not call either the district attorney or the defense lawyer for further information in the Cur-

bo case. 94 S.W.3d at 601. But unlike the newspaper reporters in *Harte–Hanks,* who inexplicably refused to review independent documentary evidence, Bunton repeatedly went to the courthouse and reviewed the official public documents on the Curbo case. There is no evidence that Bunton knew of the off-the-record agreement between the attorneys and the probation officer, and thus no evidence that he had any reason to suspect that he needed to contact them in order to obtain additional, dispositive information that could not be found in the public records.

The Court further argues that Bunton deliberately avoided the truth because he did not contact the county commissioners' court about the hot check and confiscated property funds, 94 S.W.3d at 601. But Bentley himself testified about a Q&A letter to the county commissioners' court requesting information about the funds. Bentley was further questioned about the letter's complaint that the district attorney had responded to Q&A's freedom of information request by notifying Q&A that it would have to pay a $45,000 copying bill before a representative could view the fund records.

In addition, the Court asserts that Bunton "ignored the investigation into his own charges of misconduct against the district attorney." *Id.* at 601. The outside prosecutor, Garner, who investigated Bunton's complaints did recommend that no action be taken against the district attorney. But she also testified at trial that the district attorney had indeed failed to deposit the funds properly, and that his "mistakes" could be considered "official misconduct."

Although the Court claims that Bunton "deliberately ignored" "all those who could have shown Bunton that his charges were wrong," *id.* at 601, Bunton chose to publish his allegations on Q&A, a live call-in show

that neither screened nor time-delayed its viewer calls and afforded him no opportunity to avoid or suppress the views of any person who chose to publicly contradict his comments. Bentley himself testified at trial that he refused to appear on Q&A and deliberately chose to respond to Bunton only through this lawsuit, rather than by exercising his own First Amendment right to confront and correct Bunton before the public. *See Gertz,* 418 U.S. at 344, 94 S.Ct. 2997 ("The first remedy of any victim of defamation is self-help—using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation. Public officials and public figures usually enjoy significant[ ] ... access to the channels of effective communication.").

*Harte–Hanks* did not base its actual malice finding on the reporters' general failure to investigate all possible sources of information, but on their conscious avoidance of specific evidence that would conclusively establish the truth or falsity of their story. Bunton's actions are at most the failure to investigate held not to be actual malice in *St. Amant,* not the purposeful avoidance held to establish subjective doubt in *Harte–Hanks.*

The actual malice test is not a cookbook, in which three teaspoons of objective unreasonableness can automatically substitute for one teaspoon of subjective doubt. In *St. Amant,* the Court held that the circumstantial evidence of objective unreasonableness proved only that—unreasonableness, not subjective doubt. 390 U.S. at 731, 88 S.Ct. 1323. The Court reached this conclusion despite evidence that the defendant had no personal knowledge of the truth or falsity of his comments and had completely failed to conduct any investigation of his allegations before publishing them. *Id.* at 730–33, 88 S.Ct. 1323. By contrast, the circumstantial evidence that

reporters purposefully avoided dispositive evidence in *Harte–Hanks* tended to show, not only objectively unreasonable behavior, but subjective doubt. The tendency to confuse these cases and use objective evidence as an automatic *substitute* for subjective doubt, rather than a possible *indicator* of subjective doubt, has prompted the Supreme Court to admonish: "[C]ourts must be careful not to place too much reliance on such factors." *Harte–Hanks,* 491 U.S. at 668, 109 S.Ct. 2678. "The standard is a subjective one—there must be sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of ... probable falsity.'" *Id.* at 688, 109 S.Ct. 2678 (quoting *Garrison,* 379 U.S. at 74, 85 S.Ct. 209).

In the end, circumstantial evidence of falsity must prove, by clear and convincing evidence, not merely that the defendant's actions were objectively unreasonable or that a prudent man would not have published his allegations, but that he in fact knew his statements were false or seriously doubted that they were true. *St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323 (quoted in *Harte–Hanks,* 491 U.S. at 667, 109 S.Ct. 2678). And circumstantial evidence of ill will must prove not that the defendant intended to harm the plaintiff and perhaps did not investigate as thoroughly as he might have, but that he intended to harm the plaintiff by publishing known or probable lies. *Garrison,* 379 U.S. at 74, 85 S.Ct. 209. Only such "calculated falsehood" is actual malice. *Id.* at 75, 85 S.Ct. 209.

### D

Looking at the record as a whole, I find much evidence, not dependent on Bunton's credibility at trial, suggesting that he believed his charges were true and that he did not recklessly disregard the truth or

falsity of his charges.[5] Bunton's specific allegations were made after extensive, if not very effective, research. He filed open records requests with local officials, then filed follow-up complaints when some of those requests were denied. He made numerous trips to the courthouse to read and copy public records. Often, he went on the day of his Q&A broadcast to obtain the most current information, displaying his latest photocopies in front of the television camera as he spoke. He publicly dared Bentley to either telephone Q&A or appear live on the show to refute the charges. He told callers they were "welcome" to come on the show and demonstrate that his allegations were untrue and invited them to review the facts for themselves, expressing his certainty that they could come to only one conclusion about Bentley—that he was corrupt. When Bentley threatened to sue for defamation, Bunton responded on air that he would welcome a lawsuit, because Bentley would have to testify under oath. Bunton told a friend, Tucker Farris, that he believed Bentley's clique was responsible for injustices in local government, and that Bunton wanted to bring to the surface "anything that was not right with the system." On the air, he insisted, "You can't sue anybody for slander when they're telling the truth. And this is the truth, and there is no libel or slander in this." Bunton knew that only truthful charges were absolutely protected from suit and was trying to meet that standard. On one show, Bunton described Bentley as "one of the hardest

people for Q&A to finally get some things that we could really dig our teeth in and were confident to go on the air on and go after him on because he is very, very slick." Far from making unfounded or untruthful accusations, this statement suggests that Bunton did not air his accusations until he had confidence in them.

At trial, Bentley's lawyers would not allow Bunton to outline for the jury Bentley's obligations under the Code of Judicial Conduct because he had no legal training and was "not qualified" to give opinions on such "highly complicated" legal issues. Yet this Court finds clear and convincing evidence of actual malice because Bunton misunderstood Bentley's obligations under the laws of the state and that Code.

Most, though not all, of the underlying facts Bunton used to support his accusations were accurate. It was only Bunton's conclusions that were faulty. To a layperson, it might well be plausible that dormant case dockets, individuals erroneously thrown back into jail after finishing their sentences, campaign contributions to candidates for judicial positions Bentley supervised, and appellate court reversals would suggest corruption. Bunton was also correct when he complained that Bentley did not order an audit despite receiving monthly reports revealing that a county official over whom he had supervisory authority had not deposited public funds as required by law, and that Bentley took no action after learning that a local sheriff had refused to exercise an arrest

---

5. Rather than determining which testimony the jury must have disbelieved in order to find actual malice and then accepting those findings if not clearly erroneous, as required by *Harte–Hanks*, 491 U.S. at 688, 109 S.Ct. 2678, the Court has disregarded all of Bunton's exculpatory testimony even though it is not all inconsistent with the jury's verdict. Further, the jury's inconsistent findings regarding Gates, discussed in note 1, *supra*, raise the significant possibility that the jury may have also erroneously found actual malice against Bunton despite crediting his exculpatory testimony claiming subjective belief. Because I believe that there is not clear and convincing evidence of actual malice against Bunton with or without his exculpatory testimony, I proceed using only the evidence the Court has not disputed.

warrant. However clear it may be to attorneys that none of these actions prove corrupt or criminal behavior, surely there is not clear and convincing evidence that no member of the public could genuinely suspect corruption.

To insist that ordinary citizens understand the legal system's intricacies (perhaps by consulting a lawyer, as the Court helpfully suggests, 94 S.W.3d at 601) before they comment on a judge's performance is an unconstitutional restriction on free speech. A misunderstanding that no rational and responsible lawyer could make may still be made by laypeople. *See Time, Inc. v. Pape,* 401 U.S. 279, 289–92, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) (misrepresenting allegations contained in a complaint as true facts was not actual malice); *Turner,* 38 S.W.3d at 121 (juxtaposing true facts to create defamatory false impression was not actual malice because nonlawyer may not have understood legal significance of chosen words and omitted information). As the Supreme Court explained:

> And since "... erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive,' ..." only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions. For speech concerning public affairs is more than self-expression; it is the essence of self-government.

*Garrison,* 379 U.S. at 74–75, 85 S.Ct. 209 (quoting *New York Times,* 376 U.S. at 271–72, 84 S.Ct. 710).

## IV

### A

I agree with the Court that Judge Bascom Bentley has failed to prove by clear and convincing evidence that Colonel Jackie Gates acted with actual malice. Gates' words were not defamatory on their face, and could only be understood as defamatory due to their juxtaposition with Bunton's words, which the trial court held were defamatory as a matter of law. Gates' words carry two possible meanings, one innocent, which Gates claims, and one defamatory, which Bentley advocates.

To find actual malice when the defamation is not evident on the face of the comments but a reasonable listener could have understood the words to be defamatory, our independent *Bose* review requires the public-official plaintiff to prove by clear and convincing evidence not only that the speaker had at least serious doubts of the truth of that defamatory interpretation, *see St. Amant,* 390 U.S. at 731, 88 S.Ct. 1323, but also that the speaker knew or strongly suspected that his words would convey that defamatory meaning. *See Turner,* 38 S.W.3d at 120; *see also Garrison,* 379 U.S. at 75, 85 S.Ct. 209 ("[O]nly those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions."). As one scholar explains:

> [W]hether the speaker means to say something true and it is understood to mean something false, or to say something benign and it is understood to mean something defamatory, innocent or negligent misstatement is fully protected by the "actual malice" standard. It is for this reason that implications perceived in a statement but not intended by the speaker cannot be actionable in public official or public figure cases.

SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 5.5.1.2 (3d ed.2002) (citing *Turner,* 38 S.W.3d at 120).

Under common law, statements are judged by the meaning reasonably understood by listeners. Under the First Amendment, statements must be judged by what the publisher intended them to mean. *See id.* § 5.5.1.2.

Several notable cases have required the same showing. In *Saenz v. Playboy Enters., Inc.,* an article in the defendant magazine said:

> And the U.S. adviser who had been Mitrione's predecessor for four years, whose office was on the first floor of the Montevideo *jefatura,* where torture reportedly took place and the screams of the victims reverberated, who by his own account had intimate and influential relations with the Uruguayan police, was Adolph Saenz.
>
> From Montevideo, allegations of torture by his police clients would follow Saenz through subsequent assignments. . . .

841 F.2d 1309, 1312 (7th Cir.1988). According to the court, this could have meant either that Saenz was complicit with torture, which was defamatory, or that he was in a position to know about it, which was not. *Id.* at 1315.

The court held that to prove actual malice, a public figure plaintiff must prove not only that the defendant had at least serious doubts about the truth of his statements, but also that "where the plaintiff is claiming defamation by innuendo, he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material." *Id.* at 1318. If anything, evidence that no reasonable person could have concluded that Saenz was involved in torture bolsters the defendants' claim that they did not intend to accuse him. *See id.* at 1318–19.

In *Newton v. Nat'l Broad. Co.,* 930 F.2d 662, 667 (9th Cir.1990), which we cited in *Turner,* the district court had found actual malice where a broadcast created the impression that Newton, a famous entertainer, held a hidden ownership in a Las Vegas hotel for Mafia sources and deceived state gaming authorities under oath. In merely limiting but not completely overturning a large jury verdict for Newton, the district court concluded that even if NBC had left a defamatory impression unintentionally, it "should have foreseen" that viewers could perceive the defamatory impression. *Newton,* 930 F.2d at 680. Therefore, NBC showed a reckless disregard for the truth.

The Ninth Circuit reversed. "Negligence, weighed against an objective standard like the one used by the district court, can never give rise to liability in a public figure defamation case" under *New York Times. Id.* "Such an approach eviscerates the First Amendment protections established by *New York Times.* It would permit liability to be imposed not only for what was not said but also for what was not intended to be said." *Id.* at 681.

In *Fong v. Merena,* 66 Haw. 72, 655 P.2d 875, 876 (1982), Merena displayed a sign on his lawn and around town which read:

Ushijima/Fong
Voted "Yes"
Pension/Pay Raise

Merena claimed that the sign meant that Ushijima had voted for the pension bill and Fong had voted for the pay raise legislation. *Id.* at 877. He did not realize, he said, that readers might think both politicians had voted for both bills. *Id.* Fong argued that Merena knew that he had not voted for the pension bill, and that the sign could reasonably be interpreted to say that he had. The Hawaii Supreme Court, reversing a lower court judgment, held:

It has not been clearly and convincingly shown that in making the publication, Merena believed it was false. On the contrary, he claims that it was accurate, and depending on how one views the sign there is merit to his contention. The fact that it could have been construed otherwise is not, we think, sufficient to prove that Merena acted with actual malice.

*Id.*

## B

Bentley argues that Gates made two on-air defamatory statements. In the first, Gates interrupted Bunton's exchange with a caller, who was unsuccessfully trying to point out to Bunton that he had just called another local official, not Bentley, the most corrupt local government official. When Bunton corrected himself and clarified that Bentley was in fact the most corrupt, Gates said, "yeah." In the second exchange, Bunton was listing the reasons he believed Bentley was corrupt, and Gates added two items to Bunton's list and noted there were others.

I conclude that both of these statements are genuinely ambiguous; it is possible that Gates intended to express agreement with Bunton's defamatory comments, but it is also plausible that he did not. As I have discussed, Bentley bears the burden to show by clear and convincing evidence that Gates knew or strongly suspected that listeners would interpret his statements as agreement with the substance of Bunton's comments.

Bentley has failed to meet this burden. He has not even argued, let alone proved, that Gates intended his comments to convey an accusation that Bentley was corrupt. Here, as in *Saenz*, Bentley has tried to prove only that a reasonable listener could have understood Gates' words to convey a defamatory meaning that Gates

could not reasonably have believed, *see Saenz*, 841 F.2d at 1318–19, in part because Gates admitted that he had no personal knowledge of Bentley's corruption. *See St. Amant*, 390 U.S. at 730, 733, 88 S.Ct. 1323 (lack of personal knowledge of basis for defamatory statement is not evidence of actual malice). That is no evidence of Gates' subjective intent. The First Amendment does not permit a defendant to be liable for a defamatory meaning he did not either know or strongly suspect his words would convey. I conclude that Bentley has not carried his burden to clearly and convincingly prove actual malice against Gates.

## V

*New York Times* and its progeny are designed to encourage valuable public debate by protecting false, defamatory speech that is made in error. Bentley has not clearly and convincingly proved that Bunton published the type of calculated falsehood about a public official that is beyond the protection of the First Amendment. Therefore, I believe that Bentley is just the type of public official who must, so that vigorous public debate can be guaranteed, forfeit the civil recovery a private citizen might obtain if similarly defamed. While the Court reaches the correct result in rendering judgment for Gates, it errs in failing to render judgment for Bunton as well.

Justice BAKER dissenting.

I agree with the Court's conclusion that there is clear and convincing evidence that Bunton acted with actual malice in defaming Bentley. However, I disagree with the Court's conclusion that such evidence does not exist to support Gates's liability. And, contrary to the court of appeals' determination, I would hold that Gates and Bunton are jointly and severally liable based

on the jury's finding that they conspired to defame Bentley. Finally, I am appalled at the Court's remarkable holding about the mental anguish damages award. Specifically, the Court improperly conducts a factual sufficiency review on mental anguish damages based on a tenuous and entirely incorrect conclusion that the United States Supreme Court requires such a review. Because I, for one, cannot ignore our well-established legal principles that (1) impose joint and several liability on co-conspirators, and (2) preclude this Court from conducting factual sufficiency reviews and issuing advisory opinions, I dissent.

## I. GATES'S LIABILITY: DEFAMATION, CONSPIRACY, AND JOINT AND SEVERAL LIABILITY

I disagree with the Court's holding that no clear and convincing evidence exists to support the jury's finding that Gates acted with actual malice. To the contrary, though Gates contends he never believed Bentley was corrupt, he participated on Bunton's program numerous times when Bunton repeatedly talked about Bentley's alleged corruption. And, on at least two of those occasions, Gates agreed with Bunton's statements, and Gates even listed additional examples of Bentley's alleged corruption. Based on the Court's extensive discussion about defamation jurisprudence and the actual malice standard, I conclude that this is clear and convincing evidence to support the jury's finding that Gates acted with actual malice.

The jury also found that Bunton and Gates conspired to defame Bentley. The jury assessed the damages Bunton and Gates each caused individually, but the trial court refused to hold them jointly and severally liable for the total damages. In response to Bentley's argument that the trial court erred in refusing to impose joint and several liability on Bunton and Gates,

the court of appeals conceded that conspirators can be held jointly liable for acts done in furtherance of a conspiracy. 94 S.W.3d at 577. However, the court of appeals concluded that, "[i]n order to be entitled to judgment for joint and several liability, Bentley was required to secure a jury finding on the amount of damages he suffered as a result of the conspiracy itself." 94 S.W.3d at 577 (citing *Belz v. Belz*, 667 S.W.2d 240, 243 (Tex.App.-Dallas 1984, writ ref'd n.r.e.)). The court of appeals explained that Gates could not be liable for the damages the jury awarded against Bunton, because many of the defamatory acts occurred before Gates's involvement in the Q&A program. 94 S.W.3d at 577. The court of appeals concluded that, to impose joint and several liability, a separate finding on the conspiracy damages was required but not submitted, and Bentley waived any objection to the charge as submitted. 94 S.W.3d at 577. Consequently, the court of appeals rejected Bentley's argument that the trial court should have held Gates and Bunton jointly and severally liable. 94 S.W.3d at 607.

### A. APPLICABLE LAW

A civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means." *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex.1996); *see also State v. Standard Oil Co.*, 130 Tex. 313, 107 S.W.2d 550, 559 (Tex.1937). "The essential elements are: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983) (citations omitted).

A party who joins in a conspiracy is jointly and severally liable "for *all acts done by any of the conspirators* in furtherance of the unlawful combination." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979) (quoting *State v. Standard Oil*, 107 S.W.2d at 559) (emphasis added); *see also Akin v. Dahl*, 661 S.W.2d 917, 921 (Tex.1983) ("[O]nce a civil conspiracy is found, each co-conspirator is responsible for the action of any of the co-conspirators which is in furtherance of the unlawful combination."). Thus, if a conspiracy is proven, it can extend liability in tort beyond the active wrongdoer to those conspirators who may have merely planned, assisted, or encouraged the wrongdoer's acts. *See Carroll*, 592 S.W.2d at 926. All the plaintiff must show for the alleged conspirators to be held jointly and severally liable is that they acted "in pursuance of the *common purpose* of the conspiracy." *Carroll*, 592 S.W.2d at 928 (citing *Berry v. Golden Light Coffee Co.*, 160 Tex. 128, 327 S.W.2d 436, 440 (Tex.1959)) (emphasis added). "The gist of a civil conspiracy is the damage resulting from commission of a wrong which injures another, and not the conspiracy itself." *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968).

### B. ANALYSIS

The court of appeals' holding ignores the fact that all members of a conspiracy are liable for their co-conspirators' wrongful acts. And, even if a co-conspirator's acts occurred before the conspiracy formed, all the conspiring parties are liable for those acts, as long as those acts are made in furtherance of the "common goal" of the conspiracy-in this case, defaming Bentley. *See Akin*, 661 S.W.2d at 921; *Carroll*, 592 S.W.2d at 926.

. Here, the jury found that Bunton published defamatory statements about Bent-ley with "actual malice" and "malice." The jury also found that Gates agreed with Bunton's defamatory statements and published his agreement with "actual malice" and "malice." Finally, the jury found that Bunton and Gates conspired to publish defamatory statements about Bentley. Thus, both Bunton and Gates acted with actual malice, and Bentley established the elements of the conspiracy. Accordingly, under Texas law, Gates and Bunton are jointly and severally liable "for all acts done by any of the conspirators" in furtherance of the "common purpose" of the conspiracy. *Carroll*, 592 S.W.2d at 926; *see also Akin*, 661 S.W.2d at 921. In other words, our jurisprudence does not require the trial court to separately submit each co-conspirator's civil conspiracy damages. When the jury found that liability for a civil conspiracy existed, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators.

Because the co-conspirators' common purpose in this case was to defame Bentley, the trial court was obligated to impose joint and several liability on Gates for all the damages arising from the common purpose, including those damages arising from defamatory statements made before Gates "joined" the conspiracy. *See Akin*, 661 S.W.2d at 921; *Carroll*, 592 S.W.2d at 926. Therefore, I would reverse the court of appeals' holding about Bunton's and Gates's joint and several liability and render the judgment the trial court should have rendered based on the jury's verdict. That is, Bunton and Gates, as co-conspirators, were jointly and severally liable for the total damages the jury found against each individual co-conspirator defendant.

### II. MENTAL ANGUISH DAMAGES

#### A. APPLICABLE LAW

The United States Supreme Court has held that plaintiffs in state courts may not

recover presumed or punitive damages for defamation if they do not show liability based on actual malice, which is "knowledge of falsity or reckless disregard for the truth." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Thus, defamed plaintiffs who need only prove a lower culpability standard than actual malice may only recover compensation for "actual injury." *Gertz,* 418 U.S. at 349. However, actual injuries are not limited to out-of-pocket losses. *Gertz,* 418 U.S. at 350. "Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and *mental anguish and suffering.*" *Gertz,* 418 U.S. at 350 (emphasis added); *see also Time, Inc. v. Firestone,* 424 U.S. 448, 460, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

In Texas, the standard for reviewing an excessive damages complaint is factual sufficiency of the evidence. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406 (Tex.1998); *Rose v. Doctors Hosp.,* 801 S.W.2d 841, 847–48 (Tex.1990); *Pope v. Moore,* 711 S.W.2d 622, 624 (Tex.1986). Further, Texas jurisprudence dictates that the standard for reviewing whether a trial court should have ordered a remittitur is factual sufficiency. *Rose,* 801 S.W.2d at 847–48; *Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.1987). Because whether damages are excessive and whether a remittitur is appropriate are factual determinations that are final in the court of appeals, this Court lacks jurisdiction to review such findings, consider excessive damages complaints, and suggest remittiturs. TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a); TEX.R.APP. P. 46; *Akin,* 661 S.W.2d at 921; *Sweet v. Port Terminal R.R. Ass'n,* 653 S.W.2d 291, 295 (Tex. 1983); *Hall v. Villarreal Dev. Corp.,* 522 S.W.2d 195, 195 (Tex.1975).

**B. ANALYSIS**

Because the Court concludes that clear and convincing evidence exists to prove Bunton acted with actual malice in defaming Bentley, the Court's remaining constitutionally appropriate inquiry is solely whether there is legally sufficient evidence to support the damages awarded. *See* TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a); *see also Hall,* 522 S.W.2d at 195 (Texas Supreme Court lacks jurisdiction to entertain factual insufficiency points.). But, ignoring our jurisprudence and the constitutional restraints on this Court's appellate review power, the Court impermissibly conducts a factual sufficiency review of the record—heavily putting its thumb on the scale—to conclude that the mental anguish damages award "is not merely excessive and unreasonable; it is far beyond any figure the evidence can support." 94 S.W.3d at 606. The Court explains that "while the record supports Bentley's recovery of some amount of mental anguish damages, it does not support the amount of those damages found by the jury." 94 S.W.3d at 605. And then, based on no authority whatsoever, the Court remands the case to the court of appeals "to reconsider" the excessiveness of the jury's mental anguish damages award or "to suggest" a remittitur. 94 S.W.3d at 607.

The Court asserts two reasons for why this case permits the Court to review the excessiveness of the jury's mental anguish damages award. First, relying on *Gertz,* the Court holds that "the First Amendment requires appellate review of amounts awarded for non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries and is not a disguised disapproval of the defendant." 94 S.W.3d at 605. The Court reasons that the possibility that a jury may award significant damages "un-

restrained by meaningful appellate review" poses a threat to First Amendment speech. 94 S.W.3d at 605.

But the Court misreads and misapplies *Gertz* and can only have done so purposely. Thus, the Court uses this First Amendment case as a mere guise to reach a damages issue that this Court otherwise cannot consider. In *Gertz*, the U.S. Supreme Court expressly limited its holding that defamed private plaintiffs may recover compensation only for "actual injuries" to situations in which state law sets a lower culpability standard than actual malice. *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997. The Supreme Court stated: "[T]he private defamation plaintiff who established liability *under a less demanding standard* than [that stated by *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] may recover only such damages as are sufficient to compensate him for *actual injury*." *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997 (emphasis added). Thus, a reviewing court is authorized to review damage awards and limit a defamed plaintiff's damages to those reflecting "actual injury" when the culpability standard is less than actual malice. *Gertz*, 418 U.S. at 349, 94 S.Ct. 2997.

In contrast, when a state court applies the actual malice standard the Supreme Court announced in *New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710, for determining liability for defaming public figures, *Gertz*'s concern about the type and amount of damages is no longer an issue. Under the *New York Times* test, the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279–

80, 84 S.Ct. 710. Thus, a public figure plaintiff who shows the defamatory statements were made with actual malice can recover both actual and punitive damages, as long as "competent evidence" supports the damages award. *Herbert v. Lando*, 441 U.S. 153, 164 & n. 12, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

Here, Bentley is a public figure, and the trial court required the jury to find actual malice before imposing liability on Bunton and Gates. Consequently, *Gertz*'s requirement that state courts limit damages to those reflecting actual injury when the state's law creates a lower culpability standard for private plaintiff defamation cases simply does not apply.

Additionally, even if we assume that *Gertz*'s constitutional concerns about damages applies in a public figure defamation case in which actual malice is the culpability standard, the Court improperly relies on *Gertz* to reverse the mental anguish damages award. The Court assumes that "actual injury" under *Gertz* excludes mental anguish, and therefore, *Gertz* authorizes the Court to specially scrutinize the mental anguish damages here. However, the Court refuses to recognize that, in the face of its desire to apply First Amendment rights to limit damages, the Gertz Court explicitly included mental anguish damages as "actual injuries" that a private defamed plaintiff can recover. *Gertz*, 418 U.S. at 349–50, 94 S.Ct. 2997. And, in a later case, the Supreme Court reaffirmed that a private plaintiff may recover mental anguish damages even under a lower culpability standard and required only that the actual damages awarded be supported by "competent evidence." *See Time, Inc.*, 424 U.S. at 460, 96 S.Ct. 958.

In *Time, Inc.*, the U.S. Supreme Court did not apply the *New York Times* actual malice test because the plaintiff was not a public figure. *Time, Inc.*, 424 U.S. at 454–

55. After refusing to apply the actual malice standard, the Supreme Court flatly rejected Time's argument that *Gertz* did not permit a recovery for mental anguish damages, because, according to Time, "the only compensable injury in a defamation case is that which may be done to one's reputation." *Time, Inc.*, 424 U.S. at 460, 96 S.Ct. 958. The Supreme Court stated: "In [*Gertz*] we made it clear that States could base awards on elements other than injury to reputation, specifically listing 'personal humiliation, and mental anguish and suffering' as examples of injuries which might be compensated consistently with the Constitution upon a showing of fault." *Time, Inc.*, 424 U.S. at 460, 96 S.Ct. 958.

Here, the Court does not go so far as the defendant in *Time, Inc.* to assert that *Gertz* does not allow a defamed plaintiff to recover mental anguish damages. The Court instead reads *Gertz* to mandate "appellate review of non-economic damages in defamation cases to ensure that any recovery only compensates the plaintiff for actual injuries." 94 S.W.3d at 605. But again, even if we assume *Gertz* applies to public figure defamation cases, nothing in *Gertz* even suggests that this Court must apply special appellate scrutiny other than the review this Court typically conducts when examining mental anguish damages awards. The Supreme Court expressly held in *Time, Inc.* that mental anguish is an actual injury for which defamed private plaintiffs may recover damages.

In sum, the Court relies on a defamation case that holds contrary to what the Court reads it to say, and stretches that case's holding beyond recognition, to impermissibly review the mental anguish damages award in a manner contrary to the Court's established no evidence review. Furthermore, *Gertz*'s constitutional concern that a jury's discretion in awarding damages not "inhibit the vigorous exercise of First Amendment freedoms" is not an issue here, because that case and its progeny recognize that a defamed private plaintiff may recover mental anguish damages as actual injury even when state law does not require an actual malice showing. *See Gertz*, 418 U.S. at 349, 94 S.Ct. 2997; *see also Time, Inc.*, 424 U.S. at 460, 96 S.Ct. 958; *Herbert*, 441 U.S. at 164 & n. 12, 99 S.Ct. 1635. Finally, and most importantly, *Gertz*'s concern that damage awards for defamed private plaintiffs not chill First Amendment rights is otherwise protected in First Amendment cases (like the present case) that involve public figures. That is because, before imposing liability, the Supreme Court requires that a public figure defamation plaintiff produce clear and convincing evidence that the defendant acted with actual malice. *See, e.g., New York Times*, 376 U.S. at 279–80, 84 S.Ct. 710. And, when a public figure defamation plaintiff has met this onerous burden of proving actual malice, the Supreme Court has upheld the compensatory and punitive damages awarded. *See, e.g., Harte–Hanks Communications v. Connaughton*, 491 U.S. 657, 661, 693, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

The Court also relies on Texas common law to impermissibly conduct a factual sufficiency review of the mental anguish damages award. The Court acknowledges that courts of appeals have authority to consider excessive damages complaints, but it further contends that this Court has "rejected the view that [the courts of appeals'] authority displaces [this Court's] obligation to determine whether there is any evidence at all of the amount of damages determined by the jury." 94 S.W.3d at 606 (citing and quoting *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 612 (Tex.1996)). But *Saenz* is totally inapplicable.

In *Saenz*, this Court applied a traditional no evidence review to a $250,000 mental anguish damages award that a plaintiff recovered against her workers' compensation insurance carrier. *Saenz*, 925 S.W.2d at 612. The Court acknowledged the *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex.1995), factors for proving mental anguish and discussed the limited evidence the plaintiff offered to show her mental anguish. Then, the Court concluded that there was "no evidence ... that Saenz suffered mental anguish or that $250,000 would be fair and reasonable compensation." *Saenz*, 925 S.W.2d at 614. Thus, the Court rendered judgment that the plaintiff take nothing. *Saenz*, 925 S.W.2d at 614.

Here, unlike *Saenz* where the Court held there was no evidence of mental anguish at all, the Court observes that "[t]he record leaves no doubt that Bentley suffered mental anguish as a result of Bunton's and Gates's statements." 94 S.W.3d at 606. As the Court explains, Bentley testified that the ordeal had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, disrupted his family, and distressed his children at school. Bentley said this experience was the worst of his life. Friends testified that Bentley had been depressed, that his honor and integrity had been impugned, that his family had suffered, too, adding to his own distress, and that he never would be the same. And Bunton's relentlessness in accusing Bentley of corruption caused him much anxiety. 94 S.W.3d at 606.

But, after listing this parade of horribles, the Court remarkably holds that, while this evidence supports Bentley's recovering "some amount of mental anguish damages," this is no evidence that Bentley suffered mental anguish damages amounting to $7 million. 94 S.W.3d at 606, –07.

Then, based on this amazing conclusion, the Court holds that a remand is necessary for the court of appeals to "reconsider" the excessiveness of the jury's mental anguish damages award, advises that the court of appeals suggest a remittitur, and opines that the case may need to be retried. 94 S.W.3d at 607. It is no surprise to me that the Court cites no authority for remanding the case with these instructions. For there is none. And, the Court entirely glosses over the fact, as it must to reach its conclusion, that the court of appeals already considered the excessive damages complaint. Indeed, the court of appeals concluded, "[t]here is nothing in the record to suggest that the jury was guided by anything other than a conscientious consideration of the evidence and the instructions of the trial court. We conclude that the evidence is legally and factually sufficient to support the jury's award of $7,150,000." 94 S.W.3d at 607. Yet the Court ignores this holding, inappropriately assumes a fact-finder role, and sends the case back to the court of appeals.

The U.S. Supreme Court has recognized that the Constitution does not "impose upon the States any limitations as to how, within their own judicial systems, factfinding tasks shall be allocated." *Time, Inc.*, 424 U.S. at 461, 96 S.Ct. 958. A state may apply its methods for making factual determinations, as long as some element of the state court system determines that the defendants are at fault. *Time, Inc.*, 424 U.S. at 464, 96 S.Ct. 958. This statement certainly demonstrates that our state's rules for appellate courts' reviewing claims of excessive damages—factual sufficiency in the courts of appeals only—applies to reviewing mental anguish damage awards in defamation cases. TEX. CONST. art. V, § 6; TEX. GOV'T CODE § 22.225(a); *Sweet*, 653 S.W.2d at 294–95; *see also Maritime Overseas*, 971 S.W.2d at 406; *Rose*, 801

S.W.2d at 847–48; *Pope,* 711 S.W.2d at 624.

Thus, contrary to the Court's holding, it is clear that the First Amendment does not require this Court to review the evidence supporting the mental anguish damages award to determine if it is "reasonable"—a proxy for factual sufficiency review. Simply put, the Court oversteps its constitutional appellate review boundaries to conduct what effectively results in a factual sufficiency review of the mental anguish damages award and issues a wholly advisory opinion to the court of appeals about those damages. Applying our traditional legal sufficiency standard for reviewing damages awards, I would hold that there is some evidence to support the damages the jury awarded. *See Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001).

### III. DISPOSITION

The Court's writings in this case suggest three different views about this case's final disposition: (1) JUSTICE HECHT holds that Bunton is liable while Gates is not and that a remand is required for the court of appeals to reconsider the mental anguish damages award; (2) CHIEF JUSTICE PHILLIPS holds that Bunton and Gates are not liable and thus the Court should enter a take nothing judgment against Bentley; and (3) I would hold that Bunton and Gates are liable and thus the Court should enter the judgment the trial court should have rendered based on the jury's verdict and determine Bunton and Gates jointly and severally liable.

Despite these three clearly distinctive, non-majority positions about the case's final outcome, JUSTICE HECHT's remand disposition wins the day, because seven Justices join in the judgment "remanding this cause to the court of appeals for further proceedings." *See* 94 S.W.3d at 607. It

completely escapes me how three Justices who agree with this remand disposition can join CHIEF JUSTICE PHILLIPS' opinion that neither Gates nor Bunton are liable. Though these Justices agree that no liability exists whatsoever, they join in a judgment that remands to the court of appeals solely to reassess the damages awarded.

The Court's split on the disposition certainly suggests that this case, particularly JUSTICE HECHT's writing about why a remand is necessary, should not carry any precedential value. Indeed, when the U.S. Supreme Court is dead-locked in a case because a Justice is recused, the Supreme Court renders a judgment that affirms the lower court's judgment "by an equally divided Court" and that "judgment is without force as precedent." *See Ohio ex rel. Eaton v. Price,* 364 U.S. 263, 264, 80 S.Ct. 1463, 4 L.Ed.2d 1708 (1960). Similarly, because JUSTICE HECHT does not have a majority for his remand rationale, this case should have no precedential value.

### IV. CONCLUSION

"Oh what a tangled web we weave, When first we practise to deceive!"

SIR WALTER SCOTT, *Marmion,* canto vi., stanza 17.

The Court's writing is nothing more than an epistle of the First Amendment Gospel according to JUSTICE HECHT, the effect of which is to transmogrify Texas law about reviewing mental anguish damages awards in defamation cases. I would hold that there is clear and convincing evidence to support the jury's findings that Gates and Bunton acted with actual malice in defaming Bentley. And, because the jury found Bunton and Gates were co-conspirators, I would impose joint and several liability for the damages the jury

awarded. Because the Court holds otherwise, I dissent.